**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| AHILAN NADARAJAH, *Petitioner-Appellant,* v. ERIC HOLDER JR., Attorney General; et al., *Respondents-Appellees.* | No. 05-56759 D.C. No. CV-04-1939-LAB Southern California (San Diego) ORDER |

Filed June 9, 2009

Before: Sidney R. Thomas, Richard A. Paez, and Richard C. Tallman, Circuit Judges.

Order;
Partial Concurrence and Partial Dissent by Judge Tallman

## ORDER

The government's motion for reconsideration of the Appellate Commissioner's September 29, 2008 order is denied. The attached Appellate Commissioner's September 29, 2008 order awarding attorneys' fees in the amount of $156,778.68 in favor of appellant Ahilan Nadarajah and against appellees Eric H. Holder Jr., et al., is approved and remains in effect.

**ATTACHMENT**

Filed September 29, 2008

Before: Peter L. Shaw, Appellate Commissioner

I

Background

Ahilan Nadarajah, a native of Sri Lanka, was detained upon arrival in the United States in October 2001. Nadarajah initially was granted parole but was unable to pay the $20,000 bond. Nadarajah filed applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"), based on his membership in the Tamil ethnic minority. Twice Immigration Judges ("IJs") granted Nadarajah asylum, but the government appealed, and Nadarajah remained in detention. In August 2004, Nadarajah's counsel attempted to pay the bond, but the government refused to parole Nadarajah according to the 2001 terms. In September 2004, Nadarajah's requests for parole were denied on the ground that he no longer met the bond criteria, and Nadarajah filed this petition for a writ of habeas corpus in the district court.

After the district court habeas corpus petition was pending more than one year, Nadarajah filed a Ninth Circuit petition for a writ of mandamus to compel a disposition. The mandamus petition was assigned docket number 05-75841. After the mandamus petition was filed, the district court denied Nadarajah's petition for a writ of habeas corpus, and Nadarajah withdrew the mandamus petition as moot.

Nadarajah filed this appeal, number 05-56759, from the district court's denial of the petition for a writ of habeas corpus. This court reversed the district court's decision, determining that the immigration agency abused its discretion by

denying Nadarajah's request for parole. *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1082-84 (9th Cir. 2006). The court also granted Nadarajah's motion for release pending appeal and ordered his immediate release from detention. *Id.*

Nadarajah filed a motion and an amended motion for attorneys' fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A). The government opposed the amended motion, and Nadarajah filed a reply. The court granted Nadarajah's request for attorneys' fees, and referred to the Appellate Commissioner the determination of the amount of the fee award. *See* 9th Cir. R. 39-1.9. Nadarajah filed a motion to correct the calculation of the requested attorneys' fees, which the government did not oppose. Nadarajah's motion to correct the calculation is granted, and the corrected calculation shall be employed here. The parties subsequently stipulated to the submission of breakdowns of Nadarajah's fee request by forum and hourly rates.

II

Analysis

The amount of attorneys' fees awarded under EAJA must be reasonable. *See* 28 U.S.C. § 2412(d)(1)(A), (2)(A). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). Nadarajah requests fees for the representation in all forums totalling $195,959.33. This represents 861.5 hours of work by private attorney, Judy Rabinovitz, Esq., and by five attorneys, three paralegals, and three law student interns from the American Civil Liberties Union of Southern California ("ACLU"). The requested hourly rates range from $75 to $500.

Nadarajah's ACLU counsel, Ahilan T. Arunalantham, Esq. states in a declaration that he reduced by 5 percent the hours

billed by ACLU attorneys and paralegals and by 20 percent
the hours billed by ACLU law student interns. (The across-
the-board reduction was not applied to Rabinovitz's work.)
On the ACLU's computerized time sheets, however, the 5
percent and 20 percent reductions were applied to the hourly
rates, not to the hours. In addition, Arulanantham applied a 20
percent, not a 5 percent, reduction to his hourly rate for the
fee reply. This determination of the reasonable fees uses the
hours actually reflected in the time sheets, which are the hours
actually requested by Nadarajah.

Nadarajah has not submitted Ninth Circuit Form 9. *See* 9th
Cir. R. 39-1.6. Instead, Nadarajah requests fees as follows:

## Nadarajah Market Rate Totals

|                                           | Billable Amount | Billable Hours |
|-------------------------------------------|-----------------|----------------|
| **9th Circuit**                           |                 |                |
| Attorneys & Paralegals on Timeslips:      | $70,167.12      | 266.40         |
| Clerks/Interns on Timeslips               | $204.00         | 3.40           |
| Judy Rabinovitz                           | $18,125.00      | 36.25          |
| Total:                                    | $88,496.12      | 306.05         |
|                                           |                 |                |
| **BIA**                                   |                 |                |
| Attorney & Paralegals on Timeslips:       | $9,976.31       | 40.60          |
| Clerks/Interns on Timeslips:              | $0              | 0              |
| Total:                                    | $10,132.21      | 40.60          |
|                                           |                 |                |
| **District Court**                        |                 |                |
| Attorneys & Paralegals on Timeslips:      | $38,045.80      | 153.50         |
| Clerks/Interns on Timeslips:              | $0              | 0              |
| Judy Rabinovitz                           | $6,725.00       | 13.45          |
| Total:                                    | $44,770.80      | 166.95         |

|  | Billable Amount | Billable Hours |
|---|---|---|
| **Fees** | | |
| Attorneys & Paralegals on Timeslips: | $13,356.60 | 56.60 |
| Clerks/Interns on Timeslips: | $0 | 0 |
| Total: | $13,356.60 | 56.60 |
| **Immigration Judge** | | |
| Attorneys & Paralegals on Timeslips: | $24,804.34 | 95.50 |
| Clerks/Interns on Timeslips: | $3,360.00 | 56 |
| Total: | $28,164.34 | 151.50 |
| **Mandamus** | | |
| Attorneys & Paralegals on Timeslips: | $4,013.16 | 20.10 |
| Clerks/Interns on Timeslips: | $7,182.00 | 119.70 |
| Total: | $11,195.16 | 139.80 |

|  | Billable Amount | Billable Hours |
|---|---|---|
| **Totals:** | | |
| 9th Circuit: | $88,496.12 | 306.05 |
| BIA | $9,976.31 | 40.60 |
| District Court | $44,770.80 | 166.95 |
| Fees | $13,356.60 | 56.60 |
| Immigration Judge | $28,164.34 | 151.5 |
| Mandamus | $11,195.16 | 139.80 |
| Grand Total: | $195,959.33 | 861.50 |

## A.   Hourly Rates

EAJA provides that fees may be awarded based upon prevailing market rates for the kind and quality of the services furnished, except that attorney fees shall not be awarded in

excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee. *See* 28 U.S.C. § 2412(d)(2)(A).

Nadarajah requests an hourly rate of $500, based on the special factor of the limited availability of qualified attorneys for the proceedings involved, for 49.7 hours of work by private immigration attorney Rabinovitz.

Nadarajah requests hourly rates of $300 for 2004, $315 for 2005, and $335 for 2006, based on the special factor of the limited availability of qualified attorneys for the proceedings involved, for 494 hours of work by ACLU immigration attorneys Arulanantham and Ranjana Natarajan, Esq.

Nadarajah requests the statutory maximum hourly rate, adjusted for increases in the cost of living, of $162.50 for 9.5 hours of work in 2006, on oral argument preparation, by ACLU non-immigration attorneys Catherine Lhamon, Esq., Clare Pastore, Esq., and Mark Rosenbaum, Esq.

Nadarajah requests hourly rates of $100 for 129.2 hours of work by ACLU paralegals and $75 per hour for 179.1 hours of work by ACLU law student interns.

Nadarajah's requested hourly rates do not reflect the 5 percent and 20 percent reductions in the hourly rates included in the calculation of the total fees requested and in the document entitled Nadarajah's Market Rate Totals.

The government objects to the award of fees at the prevailing market hourly rates requested for Rabinovitz, Arulanantham, and Natarajan, contending that the statutory maximum hourly rate adjusted for cost-of-living increases should be awarded for all attorneys.

### 1.  Special Factor Enhancement

Enhanced hourly rates based on the special factor of "the limited availability of qualified attorneys for the proceedings involved may be awarded under EAJA where the attorneys possess "distinctive knowledge" and "specialized skill" that was "needful to the litigation in question" and "not available elsewhere at the statutory rate." *Thangaraja v. Gonzales*, 428 F.3d 870, 876 (9th Cir. 2005); *Love v. Reilly*, 924 F.2d 1492, 1498 (9th Cir. 1991)*; see also Pierce v. Underwood*, 487 U.S. 552, 572 (1988) ("Examples . . . would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language.").

### a. Distinctive Knowledge and Specialized Skill

Nadarajah demonstrates, and the government does not dispute, that Rabinovitz, Arulanantham, and Natarajan have distinctive knowledge and specialized skill in immigration law and, in particular, constitutional immigration law and litigation involving the rights of detained immigrants.

Rabinovitz's declaration states that she is a 1985 graduate of New York University Law School and, since 1988, a staff attorney at the ACLU Immigration Rights Project in New York. Nadarajah contends that Rabinovitz is "the leading attorney in the nation litigating cases involving the rights of detained immigrants [and] has litigated numerous cases involving the prolonged detention of immigrants throughout the federal judiciary." Nadarajah cites four significant immigration detention cases where Rabinovitz was lead counsel and achieved favorable outcomes.

Arulanantham's declaration states that he is a 1999 Yale Law School graduate who clerked for a Ninth Circuit judge, has specialized in the rights of detained immigrants as an ACLU staff attorney for more than four years, and represented detained immigrants in criminal proceedings as a fed-

eral public defender for two years. Nadarajah cites eight important cases in which Arulanantham represented the immigrant or appeared on behalf of amicus curiae.

Nadarajah contends that Natarajan has represented noncitizens detained under the immigration laws for four years, citing four immigration cases in which Natarajan has appeared. Nadarajah also contends that Natarajan was named one of the top 100 women lawyers in California by California Lawyer magazine in 2005. According to the internet, Natarajan is a 1999 graduate of Columbia Law School.

Nadarajah's contentions are corroborated by the declarations of a San Francisco immigration specialist, Marc Van Der Hout, Esq., and a Los Angeles attorney and former ACLU Senior Staff Counsel, Carol A. Sobel, Esq. Van Der Hout states that he is familiar with the experience and expertise of all three attorneys and, in his opinion, they all possess "discrete and complex knowledge." He has been aware of Rabinovitz's work for nearly 20 years, and she is one of the leading immigrants' rights lawyers in the country. He has been aware of Arulanantham's and Natarajan's work for the past several years and is very familiar with their work over the past two years, during which they have successfully litigated several cases involving the prolonged detention of immigrants. Van Der Hout has co-counseled several complex immigration cases involving national security issues with Arulanantham and Natarajan, and therefore he is familiar with the excellent quality of their written work and advocacy.

Sobel states that she is very familiar with Arulanantham's and Natarajan's skill, experience, and reputation, having worked with them as co-counsel on a number of cases during the past several years. In her opinion, both Arulanantham and Natarajan enjoy exceptional reputations as attorneys and display skills and experience far beyond those of most attorneys who have been practicing for seven years. As a former ACLU staff attorney, Sobel is also familiar with Rabinovitz.

Although Sobel has never worked with Rabinovitz on a case, Sobel is aware that Rabinovitz "enjoys an exceptional reputation in the area of immigration law."

To the extent that Nadarajah contends that the three attorneys' immigration law expertise, by itself, justifies the award of enhanced hourly rates, without a showing that the attorneys possess distinctive knowledge or specialized skill necessary to this litigation, that contention lacks merit. *See Thangaraja*, 428 F.3d at 876 ("We decline to adopt counsel's proposed per se rule that 'the practice of immigration law should be classified as a specialty similar to practicing patent law.' "); *see also Perales v. Casillas*, 950 F.2d 1066, 1078-79 (5th Cir. 1992) (holding that immigration practice, unlike patent practice, is not a specialty for the purpose of awarding an enhanced rate).

### b. Needful For Litigation In Question

The Seventh Circuit has awarded enhanced rates in a published immigration case where counsel established that "knowledge of foreign cultures or of particular, esoteric nooks and crannies of immigration law . . . [was] needed to give the alien a fair shot at prevailing." *Thangaraja*, 428 F.3d at 876 (quoting *Muhur v. Ashcroft*, 382 F.3d 653, 655-56 (7th Cir. 2004)). The Third and Ninth Circuits have recognized that a specialty in immigration law can warrant enhanced rates if "distinctive knowledge" or "specialized skill" is "needful for the litigation in question," but have not held in a published case that the movant had established that such knowledge or skill was necessary to the litigation. *See Thangaraja*, 428 F.3d at 876; *Gwaduri v. INS*, 362 F.3d 1144, 1147 (9th Cir. 2004); *Rueda-Menicucci v. INS*, 132 F.3d 493, 496 (9th Cir. 1997); *Ramon-Sepulveda v. INS*, 863 F.2d 1458, 1462-63 (9th Cir. 1988); *see also Johnson v. Gonzales*, 416 F.3d 205, 213 (3d Cir. 2005). The Ninth Circuit has awarded enhanced rates in unpublished immigration cases where the movants have dem-

onstrated that distinctive knowledge or specialized skill was necessary.

Here, Nadarajah contends his case required Rabinovitz's, Arulanatham's, and Natarajan's specialized expertise in constitutional immigration law and litigation involving the rights of detained immigrants. Nadarajah also provides Van Der Hout's declaration stating that the three attorneys' "discrete and complex knowledge was required for the successful resolution of this case" and their "distinctive knowledge and exemplary skills in statutory and constitutional immigration law . . . were absolutely necessary to the successful resolution of this litigation."

The government contends that, like *Thangaraja*, this litigation required no special knowledge or skill, and therefore prevailing market rates are not justified. The government argues that this case involved the application of the immigration detention statutes, Supreme Court precedent, and an understanding of constitutional law, but turned on statutory interpretation and did not involve the application of complex statutes or regulations. The government's objection lacks merit.

Nadarajah's case involved more than established principles of law with which the majority of attorneys are familiar. *See Ramon-Sepulveda*, 863 F.2d at 1462-63. This was an unusual and complex case which required a 58-page brief and resulted in a significant 15-page published decision that is cited thus far in more than 70 other cases and 20 treatises or articles. *See Nadarajah*, 443 F.3d at 1069. The court took the fairly unusual step of ordering the immediate release of Nadarajah, who had been detained more than four years despite being granted withholding of removal at the administrative level. An amicus curiae brief in support of Nadarajah, addressing the international prohibition on prolonged and arbitrary detention, was filed by Yale Law School's Allard K. Lowenstein

International Human Rights Clinic. The oral argument was video-taped for broadcast by C-SPAN.

Like *Muhur* and the cases cited there, Nadarajah's case did not involve merely a "straightforward application" of the rules of immigration law and appellate practice. *Thangaraja*, 428 F.3d at 876 (quoting *Johnson*, 416 F.3d at 213) (declining to award enhanced rate to experienced immigration specialist who successfully contended that the government failed to consider the asylum petitioner's testimony regarding imputed political opinion, because the case did not require research into little-known areas of immigration law or particular knowledge of the petitioner's Liberian culture). As Van Der Hout states, Nadarajah's case:

> raised unique issues of statutory and constitutional immigration law in the detention context. Understanding the doctrinal background in this case required knowledge of a large body of historical material concerning immigration detention, detailed treatment of new and relatively obscure statutory provisions governing the detention of people alleged to be threats to national security, and familiarity with the growing body of modern case law concerning prolonged detention in the immigration context.

In particular, the court applied existing case law and statutory analysis regarding the indefinite detention of admissible aliens to the indefinite detention of an inadmissible alien, concluding that the general immigration statutes permit such detention only while removal remains reasonably foreseeable and that, after a presumptively reasonable six-month detention, if the alien provides good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future, the government must respond with evidence to rebut that showing. *Id*. at 1078.

Nadarajah demonstrates and a review of the briefs and opinion confirms that here, unlike in *Thangaraja*, "knowledge

of . . . particular, esoteric nooks and crannies of immigration law . . . [was] needed to give the alien a fair shot at prevailing." *Thangaraja*, 428 F.3d at 876 (quoting *Muhur*, 382 F.3d at 656). In particular, Nadarajah states that although he first won asylum before the IJ in April 2003, he remained detained without filing a habeas petition for more than one year after that victory. His present counsel began to represent him in June 2004, helped him prevail before the IJ a second time in September 2004, and filed this ultimately successful habeas corpus action when Nadarajah still was not granted parole. The specialized knowledge of these particular attorneys was needed to obtain Nadarajah's release as result of this litigation. *Id*.

Nadarajah's case also is distinguishable from *Gwaduri*, which involved a claim of ineffective assistance of counsel before the immigration agency. *See Gwaduri*, 362 F. 3d at 1147, 1149. Although the *Gwaduri* court did not discuss the reasons that fees were reduced to the statutory cap, the dissent suggested that it was because no special legal expertise was required to litigate such a claim. Here, on the other hand, Nadarajah has established and the record shows that Rabinovitz, Arulanantham, and Natarajan possessed "distinctive knowledge" and "specialized skill" that was "needful to the litigation in question." *Thangaraja*, 428 F.3d at 876.

### c. Qualified Counsel Not Available At Statutory Rate

Nadarajah also establishes that qualified counsel was not available for this litigation at the statutory maximum hourly rate. *See United States v. Real Prop. Known as 2224 Dolorosa Street,* 190 F. 3d 977, 984 (9th Cir. 1999) ("while claimants have submitted evidence that the market rates for similarly experienced counsel exceed the statutory rate, they have not demonstrated that no suitable counsel would have taken on claimants' case at the statutory rate")*; Love v. Reilly*, 924 F.2d 1492, 1496-97 (9th Cir. 1991) (remanding for further findings as to availability of attorneys in area with similar

skills who would take case at statutory rate, where only evidence in record was affidavit of attorney seeking fees stating that there were few other lawyers in Oregon with his expertise in pesticide litigation and the district court had made no findings on the issue).

Van Der Hout states that:

> the vast majority of the immigration bar of this country does not engage in federal court litigation, and of those that do, only a very small number would be willing to take on a case of this complexity. There are no qualified attorneys to my knowledge who would have undertaken such litigation at the EAJA statutory rate of $125, even adjusted for inflation.

The government objects to Van Der Hout's affidavit, without citing legal authority, because Van Der Hout does not state whether he, or immigration practitioners in general, normally bill hourly or receive a flat fee.

The government's objection lacks merit. In *Atlantic Fish Spotters Ass'n v. Daley*, 205 F.3d 488, 492-93 (1st Cir. 2000), the First Circuit discussed the showing that is necessary to establish that qualified counsel was not available:

> What the declaration needed to say, with at least modest support, is that as a practical matter the plaintiffs would be unable to find a fisheries law expert for $125 (assuming *arguendo* that one was required). We say "modest support" because of practical realities. No one expects the plaintiffs to conduct statistical surveys on a collateral matter like attorney's fees, and the antitrust laws do not encourage counsel to spend much time discussing fee levels with competing lawyers.

*Id*. at 493. According to *Atlantic Fish Spotters*, Van Der Hout's declaration satisfactorily demonstrates that no other

counsel was available to take Nadarajah's case at the adjusted statutory maximum hourly rate. Moreover, the government has failed to rebut Nadarajah's showing that qualified counsel was not available.

#### d. Prevailing Market Rates

##### i. Non-Profit Representation

The government contends that Nadarajah should not be awarded prevailing market rates, or any fees at all for that matter, because he was represented by the ACLU, a non-profit organization, rather than by private counsel. The government objects that Nadarajah did not submit his retainer agreement with the ACLU, or evidence of the ACLU employees' hourly salaries, and therefore the court cannot evaluate the appropriateness of the fee request. The government argues that "there are substantial and compelling economic reasons for allowing private firms to obtain EAJA payments at market rates where appropriate," but that non-profit organizations "do not operate on these same market principles" and therefore should not obtain prevailing market rates.

The government's contentions are not supported by legal authority and lack merit. The United States Supreme Court clarified long ago that the award of attorneys' fees under civil rights fee-shifting statutes is not cost-based, and that the award of prevailing market rates — regardless whether the claimant is represented by private counsel or a non-profit legal services organization — should not be viewed as an unjustified "windfall" profit to the attorney. *See Blum v. Stenson*, 465 U.S. 886, 892-95 (1984); *Hensley*, 461 U.S. at 433 n.7 (standards applicable to § 1988 awards "are generally applicable in all cases where Congress has authorized an award of fees to a 'prevailing party' "); *see also INS v. Jean*, 496 U.S. 154, 161 (1990) (applying *Hensley* to EAJA award).

"It is well-settled that an award of attorneys fees [under EAJA] is not necessarily contingent upon an obligation to pay

counsel . . . . The presence of an attorney-client relationship suffices to entitle prevailing litigants to receive fee awards." *Ed A. Wilson, Inc., v. GSA*, 126 F.3d 1406, 1409 (11th Cir. 1997). The government does not dispute that Nadarajah and the ACLU counsel have an attorney-client relationship. In addition, in response to the government's contentions, Nadarajah's counsel submitted a declaration stating that there is a retainer agreement, that the agreed-upon representation is at no charge to Nadarajah, and that Nadarajah has agreed to remit to the ACLU any attorneys' fees that are recovered. The ACLU's representation of Nadarajah at no charge, pursuant to the retainer agreement, does not preclude awarding reasonable attorneys' fees under EAJA, including the requested prevailing market rates.

The government's argument that the expenses associated with private representation "would far exceed those expended by a non-for-profit group," including the inference that the fees awarded should not exceed the legal workers' salaries, is unavailing. "Important public policy considerations dictate that [the court] should not punish an 'undercharging' civil rights attorney," but instead must award attorneys' fees based on prevailing market rates (or, under EAJA, where applicable, the adjusted statutory maximum hourly rates). *See Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 233 (2d Cir. 2006).

### ii. Evidence

Although Nadarajah has established his entitlement to enhanced rates under EAJA, he must also show that the requested enhanced rates are "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 & n.11. Nadarajah requests an hourly rate of $500 for 2004 to 2006 work by Rabinovitz, a 1985 graduate. Nadarajah requests the hourly rates of $300 for

2004 work, $315 for 2005 work, and $335 for 2006 work by Arulantham and Natarajan, who are 1999 graduates.

In support of the requested enhanced rates, Nadarajah submits the declaration of Sobel, a 1978 graduate, that:

> My hourly billing rate for 2006 is $590 per hour . . . . During the time that I was Senior Staff Counsel at the ACLU, I was responsible for preparing many of the fee motions . . . . I was required to obtain information to establish reasonable market rates for the ACLU lawyers. It was my practice to obtain current billing rates for lawyers of comparable skill and experience at several firms throughout the City [of Los Angeles] . . . . Since entering private practice, I have continued to survey firms each year to obtain relevant comparisons for billing rates . . . . In addition to speaking with partners at various law firms, I have also become familiar with the market rates charged by attorneys in the Los Angeles area by reviewing attorney fee applications and decisions awarding fees under fee-shifting statutes . . . . Based on my knowledge and experience, these rates [sought for Rabinovitz, Arulanantham, and Natarajan] are below comparable market rates in Los Angeles.

Attached to Sobel's declaration are copies of fee awards involving Los Angeles law firms. The district court awarded 2004 hourly rates of $340 to a 1997 graduate and $320 to a 1998 graduate. *See McClure v. City of Long Beach*, No. CV-92-2776 (C.D. Cal. Sept. 20, 2005) (Memorandum Opinion And Order Regarding Fees And Expenses). Another district court awarded 2005 hourly rates of $450 to a 1991 graduate and $305 to a 2000 graduate. *See Comite de Jornaleros de Glendale v. City of Glendale*, CV-04-3251 (Aug. 19, 2005) (Order Granting Motion For Attorneys' Fees And Costs).

Sobel states that she is familiar with the work of the 1997 and 1998 graduates and, based on her experience, they do not have the skill, experience, or reputation of Arulanantham or Natarajan. Sobel also states that "based on my experience over the past 28 years of working at the ACLU and with the pro bono bar, the skill, experience, and reputation of the lawyers at the ACLU is usually greater than that of many lawyers in large firms with comparable years of practice."

Sobel notes that, in *Comite de Jornaleros*, the district court stated that the hourly rates awarded there were well below market rate. Sobel states that 2005 hourly rates for attorneys at Loeb & Loeb who graduated in 1985, 1998, and 2000 were $485, $390, and $375, respectively. Sobel also provides a 2005 Skadden, Arps, Slate, Meagher & Flom declaration in support of requested hourly rates of not less than $560 for a pre-1998 graduate and $530 for a 1998 graduate.

Nadarajah also submits Van Der Hout's declaration that:

> I am familiar with the billing practices and rates of law firms in the San Francisco Bay Area. The $500 per hour rate requested for Ms. Rabinovitz and the $335 requested for Mr. Arulanantham and Ms. Natarajan are below the prevailing market rate for attorneys of their respective experience and expertise.

The government objects again that Van Der Hout does not state whether he, or immigration attorneys in general, normally bill hourly or receive a flat fee and, therefore, the evidence submitted in support of the requested prevailing market rates is inadequate and insufficient.

The government's objection is not supported by legal authority and lacks merit. Moreover, the government offers no evidence to rebut Sobel's and Van Der Hout's declarations and the accompanying evidence showing that the requested

rates for Rabinovitz, Arulanantham, and Natarajan are below prevailing market rates for attorneys of comparable skill, experience, and reputation. *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992) ("The party opposing the fee application has a burden of rebuttal that requires submission of evidence . . . challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits."))

Nadarajah's evidence regarding the prevailing market rates is corroborated by the Appellate Commissioner's review of many other fee applications. Accordingly, Nadarajah is awarded the requested hourly rates for Rabinovitz, Arulanantham, and Natarajan, subject to the 5 percent and 20 percent reductions applied to Arulanantham's and Natarajan's hourly rates in Nadarajah's calculation of the total fees requested.

## 2.   Adjusted Statutory Maximum Hourly Rate

Nadarajah requests compensation at the adjusted statutory maximum hourly rate of $162.50 for 2006 work by the remaining attorneys, Lhamon, Pastore, and Rosenbaum. The government does not object to the requested adjusted statutory maximum hourly rate, and Nadarajah has calculated the rate correctly. *See Thangaraja*, 429 F.3d at 876-77 (cost-of-living increases are calculated by multiplying the $125 statutory maximum hourly rate by the annual average consumer price index figure for all urban consumers ("CPI-U") for the years in which the attorney's work was performed and dividing by the CPI-U figure for March 1996 (155.7), the effective date of the statutory maximum hourly rate); *see also* Dept. of Labor, Bureau of Labor Statistics, Table 1A. CPI-U: U.S. city average at http://data.bls.gov/cgi-bin/surveymost; Notice Re: Statutory Maximum Rates Under EAJA at www.ca9.uscourts.gov. Accordingly, Nadarajah is awarded the requested $162.50 hourly rate for Lhamon, Pastore, and

Rosenbaum, subject to the 5 percent reduction applied to these hourly rates in Nadarajah's calculation of the total fees requested.

### 3.   Paralegal And Intern Rates

Nadarajah requests hourly rates of $100 per hour for paralegals and $75 per hour for law student interns. The government does not object. Based on the Appellate Commissioner's experience, the requested paralegal and law student intern rates are "in line with those [rates] prevailing in the community for similar services by [paralegals] of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 & n.11. The requested hourly rates for the paralegals and interns are awarded, subject to the 5 percent and 20 percent reductions applied to the respective hourly rates in Nadarajah's calculation of the total fees requested. *See Richlin Sec. Serv. v. Chertoff*, 128 S. Ct. 2007, 2013, 2019 (2008) (under EAJA, paralegal fees may be awarded at prevailing market rates; recovery of paralegal fees is not limited to attorney's cost for services).

### B.   Number Of Hours

Nadarajah requests 861.5 hours for the representation before the IJ, Board of Immigration Appeals ("BIA"), district court, and Ninth Circuit. There are discrepancies among Nadarajah's and the government's breakdowns of the number of hours incurred before each forum. The document entitled "Nadarajah Market Rate Totals," submitted by stipulation of the parties and reproduced above, is used in determining the reasonable hours.

The government objects generally that the hours requested for the ACLU legal workers are "excessive, such as duplicated time for multiple attorneys to conduct the same task or review the same document." The government does not object to Rabinovitz's time entries or requested hours.

Arulanantham's declaration states that he exercised billing judgment to ensure that the requested hours are reasonable. He eliminated a number of entries he thought were duplicative or not essential to the litigation. Where the three lead attorneys' time entries were inconsistent, he applied the shorter of the times in the different entries. In addition, Arulanantham reduced the hourly rates by 5 percent and 20 percent, as discussed above. This across-the-board reduction was not applied to Rabinovitz's fees, but Rabinovitz states in her declaration that "I exercised billing judgment by significantly reducing the number of hours I spent consulting with co-counsel. Although I believe the fees I eliminated were compensable, I nevertheless chose not to seek compensation for that work, out of an abundance of caution to ensure we were not billing excessively."

A review of the record and the ACLU and Rabinovitz time sheets reveals no unreasonable duplication of effort. Except for the hours disallowed below, pursuant to the government's specific objections, the requested hours were reasonably expended and are awarded. *See Hensley*, 461 U.S. at 433-34.

### 1.   Agency Representation

Nadarajah requests 151.5 hours and $28,164.34 in fees for the representation before the IJ by Arulanantham, Natarajan, paralegals, and interns. Nadarajah also requests 40.6 hours and $9,976.31 in fees for the representation before the Board of Immigration Appeals ("BIA") by Arulanantham, Natarajan, and the paralegals.

The government correctly objects to Nadarajah's request for fees for representation before the IJ and the BIA. *See Ardestani v. INS*, 502 U.S. 129, 136 (1991) (administrative deportation proceedings are not adversary adjudications under Administrative Procedure Act and therefore do not fall within category of proceedings for which EAJA award is authorized).

Nadarajah argues that he may recover fees for the administrative agency representation because this work was "intimately connected" to the habeas corpus litigation before the district court and this court, on which he prevailed, and therefore that EAJA fees are authorized. This argument fails.

Nadarajah relies on pre-*Ardestani* cases holding that EAJA fees may be awarded for administrative proceedings "intimately tied to the resolution of the judicial action and necessary to the attainment of the results Congress sought to promote by providing for fees." *Pollgreen v. Morris*, 911 F.2d 527, 534-36 (11th Cir. 1990) (citing *Sullivan v. Hudson*, 490 U.S. 877, 888 (1989)). Since *Ardestani*, *Hudson's* holding has been narrowly applied and limited to post-litigation situations like *Pollgreen*, where there was a court-ordered remand for further administrative proceedings and the agency representation was necessary to carrying out the court's order. *See Friends of Boundary Waters Wilderness v. Thomas*, 53 F.3d 881, 887-88 (8th Cir. 1995) (collecting cases). "[P]relitigation administrative proceedings do not have the requisite ancillary relationship with the judicial action," to permit an award of fees under *Hudson*. *Id.* at 887.

In contrast, Nadarajah claims fees for counsel's efforts in building the evidentiary record before the administrative agency during the IJ and BIA removal proceedings, before the district court action or the appeal to this court were filed. Nadarajah contends that because counsel submitted the removal proceeding record to the district court, in lieu of requesting an evidentiary hearing, Nadarajah should be awarded EAJA fees for the administrative proceedings. In support of this argument, Nadarajah cites *Webb v. Bd. of Educ. of Dyer County*, 471 U.S. 234, 243 n.19 (1985), and *Lambert v. Fulton County*, 151 F.Supp.2d 1364, 1372 (N.D. Ga. 2000) (citing *Pennsylvania v. Del. Valley Citizens Council for Clean Air*, 478 U.S. 546, 561 (1986)). None of the cited cases involve EAJA or administrative removal proceedings. *Webb* and *Delaware Valley* are pre-*Ardestani*, and *Lam-*

*bert* is not binding authority in the Ninth Circuit. The cases cited by Nadarajah are not dispositive here.

Nadarajah argues that he submitted the administrative record in lieu of an evidentiary hearing to "conserv[e] the resources of all concerned," and that "reading EAJA to effectively punish counsel for this choice creates a perverse incentive to waste judicial resources . . . in the hope of recovering fees." Nadarajah invokes language from *Hudson*'s language regarding avoiding anomalous results and frustrating the purposes of EAJA. The *Hudson* court reasoned that barring EAJA fees for mandatory, court-ordered administrative proceedings on remand would "throw the Social Security claimant a lifeline that was too short" and create an "incentive . . . for attorneys to abandon claimants after judicial remand." *Hudson*, 490 U.S. at 890.

Counsel's efforts to avoid a duplicative evidentiary hearing are commendable, and they are relevant to the determination of the reasonable fee for the district court proceedings. Nevertheless, the *Hudson* rationale does not justify an award of fees for the pre-litigation administrative removal proceedings here, which were not undertaken pursuant to a court order. The pre-litigation administrative proceedings here did not involve "the requisite degree of direct interaction between a federal court and an administrative agency to justify an award of fees" under EAJA. *Friends of Boundary Waters Wilderness*, 53 F.3d at 887.

Nadarajah's request for 192.1 hours and $38,140.65 in fees for the IJ and BIA representation by Arulanantham, Natarajan, and the paralegals is denied.

2. District Court

For the district court habeas corpus proceedings, Nadarajah requests 13.45 hours and $6,725 in fees for Rabinovitz and 153.5 hours and $38,045.80 in fees for Arulanantham, Natara-

jan, and the paralegals. The district court proceedings were pending from September 24, 2004 to October 28, 2005. The government does not object to the hours requested by Rabinovitz. In a chart, attached as Exhibit A to the government's opposition, the government objects to specific hours billed by the others for the district court proceedings, but does not state the reasons for the objections. Nadarajah has not responded to the specific objections, arguing that they are without basis or authority. Indeed, "[i]f opposing counsel cannot come up with specific reasons for reducing the fee request that the . . . court finds persuasive, [the court] should normally grant the award in full, or with no more than a haircut [that is, a small, 10 percent reduction]." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112, 1116 (9th Cir. 2008). Nevertheless, the rationales for some of the objections are apparent, and some of the objections have merit.

### a. Clerical

The government objects to the following entries by a paralegal:

1.85 hours (of a total 3.7 hours) on August 17, 2004 (ID No. 23630) for research and an email to Natarajan regarding habeas corpus petitions, filing procedures, and attorney admission, and for requesting checks for the filing and attorney admission fees;

2.7 hours from August 19 to September 21, 2004 (ID Nos. 23633, 23635, 23722, 23750 & 24012) for obtaining transcripts of the immigration court proceedings for submission to the district court, which involved telephone calls and follow-up correspondence to the immigration court, memos to Arulanantham and Natarajan, and purchase of and sending blank tapes to the immigration court;

0.5 hour on March 18, 2005 (ID No. 24747) for "prepare cover ltr for return of cashiers check";

0.2 hour on March 25, 2005 (ID No. 24748) for "track package"; and

0.8 hour on February 16, 2005 (ID No. 24557) for "Assemble and organize documents pertaining to exclusion of evidence; correspondence to J. Silk and H. Forden of the Lowenstein Human Rights Clinic forwarding same."

Apparently, the government contends that the filing, transcript, and document organization time was clerical in nature and should have been subsumed in firm overhead rather than billed at paralegal rates. This contention has merit. *See Davis v. City & County of San Francisco*, 976 F.2d 1536, 1543 (9th Cir. 1992) (citing *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989)); *see also Keith v. Volpe*, 644 F. Supp. 1312, 1316 (C.D. Cal. 1986). When clerical tasks are billed at hourly rates, the court should reduce the hours requested to account for the billing errors. *See Davis*, 976 F.2d at 1543; *see also Action on Smoking & Health v. CAB*, 724 F.2d 211, 222-23 (D.C. Cir. 1984).

To account for the paralegal's billing of clerical work, the district court fee request is reduced by 6.05 hours at the paralegal's $100 hourly rate, reduced 5 percent by Nadarajah's counsel to $95. Accordingly, the district court fees are reduced by a total of $574.50 on this ground.

### b. Unnecessary/Staffing

The government objects to the following entries by Arulanantham:

1.1 hours on September 30, 2004 (ID No. 27078) for "PC on habeas petition with Ranjana and Judy, research on other habeas petitions to challenge parole denials";

2.35 hours on September 23, 2004 (ID No. 27082) for "discussion w/ Ranjana and Judy on brief";

1.8 hours on January 26, 2005 (ID No. 27100) for "Calls to get amicus help on confrontation arguments";

0.7 hour on January 27, 2005 (ID No. 27101) for "Letter to client with documents, pictures, etc. Also call to opposing counsel regarding trip to Sri Lanka";

1.1 hours on April 11, 2005 (ID No. 27274) for "Review of Lowenstein Clinic materials on secrecy and due process";

1.7 hours on April 12, 2005 (ID No. 27274) for "Review of Lowenstein materials on secrecy and due process";

1.1 hours on May 2, 2005 (ID No. 27277) for "Confrontation Clause research"; and

0.7 hour on August 16, 2005 (ID No. 27288) for "review of legislative history memo."

The government apparently contends that the case was overstaffed, or objects to as unnecessary Arulanantham's conferencing with two other attorneys, consultation with amicus curiae, and, while the habeas corpus petition was pending, continuing to research and develop certain issues. This court recently addressed whether a civil rights attorney's time was unnecessary:

> Lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.

*Moreno*, 534 F.3d at 1112. Moreover, "the . . . court may not set the fee based on speculation as to how other firms would have staffed the case." *Id.* at 1114. "Modeling law firm economics drifts far afield of the *Hensley* calculus and the statutory goal of sufficiently compensating counsel in order to attract qualified attorneys to do civil rights work." *Id.* at 1115. Based on the Appellate Commissioner's review of fee applications in similar cases, Arulanantham reasonably expended the contested hours, and the hours are awarded.

### c. Other

The time sheets submitted in support of Nadarajah's fee request are coded by forum, but some time entries do not have a forum code. The government's objection chart, attached as Exhibit A to its opposition, employs Nadarajah's timesheet's coding. Some of the objections on the chart, therefore, are not coded by forum. Thus, the government's objections for the period the district court proceedings were pending include uncoded entries not discussed above. The government apparently objects to these entries because they involve time spent before the administrative agency and on the Ninth Circuit mandamus petition. The government's objections to time spent before the administrative agency and on the Ninth Circuit mandamus petition are addressed elsewhere, and the hours requested for the district court proceedings are not reduced further on this ground.

Counsel's efforts to avoid a duplicative evidentiary hearing in the district court, by submitting the transcripts of the administrative hearings, are taken into account in awarding reasonable fee for the district court proceedings.

### 3.   Ninth Circuit Mandamus Petition (No. 05-75841)

For the Ninth Circuit Mandamus petition, Nadarajah requests 20.1 hours and $4,013.16 in fees for Arulanantham, Natarajan, and the paralegals, and 119.7 hours and $7,182 in

fees for the law student interns. The mandamus petition was pending from October 11 to December 7, 2005.

### a. Entitlement

The government objects to Nadarajah's request for EAJA fees for filing the Ninth Circuit petition for a writ of mandamus, which sought to compel the district court to decide Nadarajah's pending habeas corpus petition. The government argues that the government was not a party to the mandamus petition and that Nadarajah did not prevail on the mandamus petition. After the district court decided the habeas corpus petition, Nadarajah withdrew the mandamus petition and this court did not have an opportunity to address its merits.

The government's objection is not supported by legal authority and lacks merit. The government was a real party in interest to the mandamus petition, which was a reasonable step in the habeas corpus litigation against the government in which Nadarajah ultimately prevailed. *See Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1053 (1991) (*Henley* establishes the general rule allowing attorneys' fees for services that contribute to the ultimate victory in the lawsuit); *Del. Valley*, 478 U.S. at 561 (attorneys' fees may be awarded for work that is useful and of a type ordinarily necessary to secure the final result obtained from the litigation); *see also Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (standard is whether work "would have been undertaken by a reasonable and prudent lawyer to advance or protect [the] client's interest in the pursuit of a successful recovery").

When Nadarajah filed the district court habeas corpus petition, he had been in detention for four years, since October 2001, despite twice winning asylum. Nadarajah was denied parole while the government appealed the IJ decisions. When Nadarajah filed the Ninth Circuit mandamus petition, the habeas corpus petition seeking his release had been pending

one year without a decision. In these circumstances, Nadarajah's counsel reasonably believed that mandamus relief was necessary to secure Nadarajah's timely release or obtain denial of the petition so that Nadarajah could appeal to the Ninth Circuit. According to the mandamus petition, Nadarajah's counsel already had telephoned the district court regarding the status of the case and filed a request for a decision or status conference.

Nadarajah's mandamus petition may well have been the catalyst for the district court's habeas corpus decision, although this court 's intervention was unnecessary. This is not an atypical occurrence when a mandamus petition is filed to compel district court action. Nadarajah filed the mandamus petition on October 11, 2005, and the district court issued its decision on the habeas corpus petition on October 27, 2005. Once Nadarajah obtained the district court's ruling on the habeas corpus petition, he filed and prevailed in his Ninth Circuit appeal, securing all the relief he sought against the government in the habeas corpus litigation — his immediate release in March, 2006, after five years of detention.

Therefore, this court determined that Nadarajah was a prevailing party entitled to an award of EAJA fees for the habeas corpus litigation. Because Nadarajah's mandamus petition was a reasonable step in the habeas corpus litigation, in which Nadarajah ultimately prevailed, Nadarajah is entitled to EAJA fees for his attorneys' work on the mandamus petition. *See Cabrales*, 935 F.2d at 1053.

### b. Reasonableness

Besides objecting generally to awarding fees for the mandamus petition, the government does not state other reasons for objecting to the time entries regarding the mandamus petition. Notably, Nadarajah's counsel does not appear to have billed for filing the motion to withdraw the mandamus petition, after the district court issued a decision. The use of law

student interns for the majority of the work was cost-effective. But a review of the time entries shows that some paralegal time was spent on impermissible clerical activities, as follows:

4.5 hours on September 30, 2005 (ID No. 25765) for "Assemble and organize exhibits to Petition for Writ of Mandamus; revisions to Petition; prepare certificate of compliance and statement of related cases; t/c w/ court clerk re procedure for mandamus; prepare check request for filing fee";

0.2 hour (ID No. 25779) on October 13, 2005 for "Check docket to confirm receipt of mandamus petition; email to AA re same"; and

0.2 hour (ID No. 25829) on October 24, 2005 for "Check docket for briefing schedule or order re: Petition for Writ of Mandamus; email to AA, RN re: same."

To account for the paralegal's billing of clerical work, the mandamus petition fee request is reduced by 4.9 hours at the paralegal's $100 hourly rate, reduced 5 percent by Nadarajah's counsel to $95. Accordingly, the district court fees are reduced by a total of $465.50 on this ground.

4.   Ninth Circuit Appeal (No. 05-56759)

For the Ninth Circuit appeal, other than the fee litigation, Nadarajah requests 36.25 hours and $18,125 in fees for Rabinovitz, 266.4 hours and $70,167.12 in fees for Arulanantham, Natarajan, and the paralegals, and 3.4 hours and $204 for law student interns. The notice of appeal was filed November 10, 2005. The government does not object to the Ninth Circuit hours requested for Rabinovitz.

a. Client Communication

The government contends, without citing specific time entries or legal authority, that Arulanantham should not have

spent 17 hours visiting and briefing Nadarajah, because on appeal the client needs no preparation and the attorney needs little or no client input. In Exhibit A to the government's opposition, however, the government objects to the following time entries by Arulanantham that relate to client communication, without providing reasons for the objections: 0.5 hour of total 1 hour on November 2, 2005 (ID No. 27295) for "Work on strategy and review of opinion after district court denied habeas. Also drafted letter to client, along with articles for his review concerning situation in Sri Lanka"; and

4.35 hours on November 12, 2005 (ID No. 27303) for "Visit to client, long discussion of case status with habeas and its interaction with removal proceedings. Travel to and from Otay Mesa."

Nadarajah responds that the detention center's distant location and cumbersome telephone visitation procedures justified spending so many hours for client visiting and briefing during the appeal. Moreover, Nadarajah is not fluent in English and Arulanantham is not fluent in Tamil. Under the circumstances, all hours requested for client communication were reasonably expended. *See Hensley*, 461 U.S. at 433-34.

### b. Oral Argument

The government contends, without citing specific time entries or legal authority, that Arulanantham should not have required 40 hours to prepare for oral argument, because Arulanantham already had spent more than 40 hours briefing the appeal. This contention lacks merit. As discussed above, this was a significant case because of its importance to Nadarajah, who had been detained for more than four years, and its impact on the law regarding indefinite detention. The case also was complex, presenting unique statutory and constitutional questions that required a 58-page brief, warranted an amicus curiae brief, and resulted in a 15-page opinion.

To prepare for oral argument, Arulanantham states that he reviewed the voluminous record, researched the opinions of the panel judges, organized two moot court arguments with experienced ACLU and outside counsel, and researched several unbriefed issues, one of which arose at argument. Nadarajah does not request fees for the outside counsel who participated in oral argument preparation. Based on the Appellate Commissioner's review of fee applications in similarly complex appeals, Arulanantham reasonably spent 40 hours to prepare for oral argument. *See Hensley*, 461 U.S. at 433-34.

### c. Other

The government also objects to the following Ninth Circuit time entries by Arulanantham, without explaining the reasons for the objections:

0.5 hour on November 4, 2005 (ID No. 27296) for "talk w/ Judy regarding Njdjh habeas";

5 hours on November 8, 2005 (ID No. 27299) for "case law research on various issues concerning interim reliefs, drafting motion to expedite and release pending appeal";

1.8 hours on November 10, 2005 (ID No. 27300) for "long conversation and email with AUSA concerning attempt at settlement";

2.3 hours on November 11, 2005 (ID No. 27301) for "long conversation w/ Judy about edits to mtn for interim release";

5.5 hours on November 14, 2005 (ID No. 27302) for "final work on motion to expedite — researching gaps (e.g. Sri Lankan CAT cases), talk w/ Judy Rabinovitz about strategy, inputting changes to statutory and constitutional section";

2.1 hours on December 4, 2005 (ID No. 26991) for "editorial changes to brief (reply on mtn for interim release) dis-

cussed w/ Adam and Judy, research on standard for stays"; and

2.6 hour on January 6, 2006 (ID No. 27000) for "Review of BIA Decision and AG certification papers, strategic thought about next move for habeas litigation."

The reasons for the government's objections are not clear, but they appear to be based on concerns about staffing and necessity discussed above regarding the district court litigation. A fair amount of conferencing among the attorneys was reasonable for an appeal of this complexity, and none of the cited time entries appears unreasonable. *See Hensley*, 461 U.S. at 433-34. Given Nadarajah's lengthy detention, Nadarajah's counsel reasonably sought interim relief or an expedited appeal, which the court granted. *See Del. Valley*, 478 U.S. at 561; *Moore*, 682 F.2d at 839. The requested appellate hours are awarded.

### 5. Fees

For the fee litigation, Nadarajah requests 56.6 hours and $13,356.60 in fees for Arulanantham and the paralegals. Although Pastore assisted with the fee reply, Nadarajah does not request fees for her work. Arulanantham applied a 20 percent reduction, rather than a 5 percent reduction, to his hourly rate for the reply.

The government does not object to specific time entries concerning the fee litigation. A review of the fee submissions reveals that the requested time was reasonably expended, and the time is awarded in full.

### C. Summary

As discussed above, 203.05 hours and $39,180.65 in fees are disallowed for the administrative proceedings and for cler-

ical work on the district court and mandamus proceedings. Fees and hours are awarded as follows:

| Forum | Requested Fees | Requested Hours | Awarded Fees | Awarded Hours |
|---|---|---|---|---|
| Admin. | $ 38,140.65 | 192.10 | 0 | 0 |
| Dist. Ct. | $ 44,770.80 | 166.95 | $ 44,196.30 | 160.90 |
| Mandamus | $ 11,195.16 | 139.80 | $ 10,729.66 | 134.90 |
| 9th Cir. | $ 88,496.12 | 306.05 | $ 88,496.12 | 306.05 |
| Fees | $ 13,356.60 | 56.60 | $ 13,356.60 | 56.60 |
| Total | $195,959.33 | 861.50 | $156,778.68 | 658.45 |

III

Conclusion

Attorneys' fees in the amount of $156,778.68 are awarded in favor of appellant Ahilan Nadarajah and against appellee Michael B. Mukasey. This order sent to the agency shall serve to amend the court's mandate.

TALLMAN, Circuit Judge — Concurring in part; dissenting in part:

Today the court approves fees well in excess of the amount Congress deemed appropriate when enacting the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. While I agree that Nadarajah is entitled to a fee award, and I concur in the number of hours approved as to each attorney, I believe the court should follow the legislatively imposed compensation guidelines for public legal counsel. While this was undoubtedly a complex immigration case, I do not think it warrants fees that dwarf not only the congressionally authorized EAJA fees, but also those awarded from the public fisc to lawyers handling the most complicated cases in the circuit —i.e., capital habeas corpus appeals. I respectfully dissent.

## I.  Background

In 2006, we granted Ahilan Nadarajah's petition for a writ of habeas corpus under 28 U.S.C. § 2241. *Nadarajah v. Gonzales*, 443 F.3d 1069, 1084 (9th Cir. 2006). We found that the alien was wrongfully detained by the United States Immigration and Naturalization Service during the pendency of his asylum, withholding of removal, and protection under the Convention Against Torture immigration proceedings. *Id.*

After our decision issued, Nadarajah sought attorney's fees under EAJA. The parties briefed the issue and we referred the claim to our Appellate Commissioner (the "Commissioner") for further consideration on the merits and his recommendation on an appropriate fee award. Once the parties failed to negotiate an agreed-upon fee award, the Commissioner entered an order granting $156,778.68 in legal fees to Nadarajah's team of immigration attorneys.

The Appellee filed a motion to reconsider the Commissioner's recommendation, which, with slight modification, the court upholds today. I disagree only with the Commissioner's

recommended hourly fee award with regard to Nadarajah's three main attorneys—Judy Rabinovitz, Ahilan Arulanantham, and Ranjana Natarajan—for whom the Commissioner recommends, and the majority now grants, enhanced fees at rates well in excess of hourly rates typically charged by immigration or habeas attorneys.

## II.  Enhanced Hourly Fees

The EAJA provides that fees may be awarded "based upon prevailing market rates for the kind and quality of the services furnished" so long as those fees do not exceed $125 per hour. 28 U.S.C. § 2412(d)(2)(A). A court may decide that this amount should be modified if a cost-of-living increase or some "special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." *Id.*

In *Love v. Reilly*, 924 F.2d 1492 (9th Cir. 1991), we delineated a three-part test that governs what a petitioner must show in order to receive an award of enhanced attorneys fees above the statutory maximum: (1) "the attorney must possess distinctive knowledge and skills developed through a practice specialty"; (2) "those distinctive skills must be needed in the litigation"; and (3) "those skills must not be available elsewhere at the statutory rate." *Id.* at 1496. We most recently reaffirmed the three-pronged inquiry in *Natural Resources Defense Council, Inc. v. Winter*, 543 F.3d 1152, 1158 (9th Cir. 2008).

While neither *Love* nor *Winter* dealt with a specialization in immigration, we have recognized that an attorney can specialize in that field. In *Rueda-Menicucci v. INS*, 132 F.3d 493 (9th Cir. 1997), we found that "a speciality in immigration law could be a special factor warranting an enhancement of the statutory rate." *Id.* at 496 (citing *Pirus v. Bowen*, 869 F.2d 536, 542 (9th Cir. 1989)). However, the *Rueda-Menicucci* panel did not grant an enhancement based on the attorneys'

specialization. Instead, we found that there was a need to adjust the statutory maximum amount—at that time $75 per hour—to account for inflation. *Id.*

We have rarely decided to grant special factor enhancements in immigration cases, and these few previously rendered decisions have eluded publication. *See Freeman v. Mukasey*, No. 04-35797, 2008 WL 1960838, at *4 (9th Cir. Feb 26, 2008); *Fang v. Gonzales*, No. 03-71352, 2006 WL 5669901, at * 3 (9th Cir. Oct. 30, 2006).

## A. Practice Specialty

The first prong of the three-part test is to determine whether "the attorney . . . possess[es] distinctive knowledge and skills developed through a practice specialty." *Love*, 924 F.2d at 1496. On this point, the statute contemplates that attorneys be "qualified . . . in some specialized sense, rather than just in their general legal competence." *Pierce v. Underwood*, 487 U.S. 552, 572 (1988). Distinctive knowledge, in turn, may be "an identifiable practice specialty such as patent law, or knowledge of foreign law or language." *Id.* "Although a court may find that other 'special factors' counsel in favor of an enhanced fee award, these special factors may not be 'of broad and general application.' " *Winter*, 543 F.3d at 1158 (quoting *Pierce*, 487 U.S. at 573).

I could find no cases in which one of our panels definitively ruled that the attorney possessed the requisite specialization in immigration, though cases have noted that such a specialization could exist. *See Thangaraja v. Gonzales*, 428 F.3d 870, 876 (9th Cir. 2005); *Rueda-Menicucci*, 132 F.3d at 496. In *Thangaraja*, the panel "decline[d] to adopt counsel's proposed per se rule that 'the practice of immigration law should be classified as a specialty similar to practicing patent law.' " 428 F.3d at 876. It found that generalized experience in the area of immigration law did not evidence some " 'distinctive knowledge' or 'specialized skill' necessary to litigat-

ing Thangaraja's case." *Id.* (quoting *Rueda-Menicucci*, 132 F.3d at 496).

While we have said that immigration law may have its own specializations, we have never explained what those might be, or what prerequisites one must possess to specialize in the field.[1]

Two non-published orders determined that the attorneys had the requisite specialization. The analysis within those Ninth Circuit orders is premised on a Seventh Circuit case indicating when one might have "distinctive knowledge" or "specialized skill" in immigration law. In *Muhur v. Ashcroft*, 382 F.3d 653 (7th Cir. 2004), the Seventh Circuit concluded, as we have, that immigration attorneys are not "*ipso facto* entitled to fees above the statutory ceiling." *Id.* at 656. But, it added, "the cases pierce the ceiling for immigration lawyers who bring relevant expertise to a case, such as knowledge of foreign cultures or of particular, esoteric nooks and crannies of immigration law, in which such expertise is needed to give the alien a fair shot at prevailing." *Id.* Our two non-published orders find these "esoteric nooks and crannies of immigration law."

---

[1]We have stated when an attorney might have a specialization in another field. Recently, *Winter* gave some guidance on when one might possess specialized skill in an environmental case. The junior attorneys claimed that they had specialized skill in the case because they had worked on the companion case, worked under time pressures, and were matched against a gaggle of government attorneys. *Winter*, 543 F.3d at 1160. We found that none of these indicated that the attorneys were more specialized in, or possessed distinctive knowledge of, environmental law. *Id.* On the other hand, the senior attorney on the case and attorneys from the Natural Resources Defense Council ("NRDC") were found to have the requisite experience for them to have "specialized skill." The senior attorney had "a broad litigation practice." *Id.* at 1156. There was "evidence in the record that he [had] experience in alternate dispute resolution and arbitration, appellate litigation, entertainment transactions, intellectual property litigation, and general litigation," and he had been co-lead council in multiple environmental law cases. *Id.* The NRDC attorneys worked specifically on marine mammal protection and the effect of sonar on marine wildlife, issues both central to the litigation. *Id.*; *see also id.* at 1161.

First, in *Fang*, the Commissioner recommended that the lead attorney in the case, Ms. Smith, should receive an enhancement above the statutory maximum of $125 per hour. 2006 WL 5669901. Smith's affidavit stated she had "practiced all aspects of Immigration law in Montana for the past 11 years," and was "an adjunct professor of, [and lecturer on,] immigration law." *Id.* at *3. The Commissioner based most of his decision on the location of the case, Montana, and not on Smith's specialization. *See discussion infra.* However, he at the very least believed that Smith's affidavit showed she met the first prong of the test because she received the requested enhancement in hourly fees.

Also, in *Freeman*, the Commissioner recommended an increase because "[l]ike *Muhur* and the cases cited there, Freeman's case did not involve merely a 'straightforward application' of well-known rules of immigration law or federal practice." 2008 WL 1960838, at *5. Sworn affidavits convinced the Commissioner that an increase from the statutory maximum of $125 per hour to $250 per hour was warranted. These affidavits stated that the attorney in question had "more than nine years of distinctive, specialized expertise in immigration law study, practice, and teaching, with a particular focus on district court habeas corpus petitions and adjustment of status involving an untimely death of the petitioning immediate relative." *Id.* The Commissioner then moved on to the other prongs of the test.

In the instant case, the majority adopts the view that these attorneys have specialized knowledge in the field of constitutional immigration law and litigation involving the rights of detained immigrants, and then concludes that their years of experience in immigration law and the number of cases they have dealt with concerning detention constitutes special knowledge. Even though the government does not challenge Nadarajah's argument that his attorneys possess "specialized skill" or "distinctive knowledge," I find it problematic that the majority holds attorneys Rabinovitz, Arulanantham, and

Natarajan have distinctive knowledge in a specialized area of immigration law warranting such extraordinary hourly rates.

The majority implicitly relies on the attorneys' own declarations and two sworn affidavits by additional counsel, finding these three attorneys to possess "distinctive knowledge" and "specialized skill." However, we have never explained what evidence is needed to show that one's attorneys have a specialized skill which warrants enhancement of fees. Nor have we said which areas of immigration law can be considered a specialization or require some type of "specialized skill." It has only been found that generalized "immigration law" is not such a specialty.

### B.   Needful in this Litigation

Though we have embraced this second prong of the test, we have never held in a published immigration case that the movant had established that such knowledge or skill was necessary to the litigation. *See Thangaraja*, 428 F.3d at 876; *Gwaduri v. INS*, 362 F.3d 1144, 1147 (9th Cir. 2004); *Rueda-Menicucci*, 132 F.3d at 496; *Ramon-Sepulveda v. INS*, 863 F.2d 1458, 1462-63 (9th Cir. 1988). However, again, unpublished orders have found that specialized skill was needed in an immigration case. *See Freeman*, 2008 WL 1960838, at *4 (where the case involved " 'matters of first impression' . . . involving 'the interplay between the adjustment of status regime and the visa waiver program,' particularly with regard to surviving spouses, and 'the text and purpose of [a] complex statute' ") (quoting *Freeman v. Gonzales*, 444 F.3d 1031, 1033 (9th Cir. 2006)); *Fang,* 2006 WL 5669901.[2]

In the instant case, the majority finds that the attorneys' specialized knowledge—assuming, *arguendo*, they possess

---

[2]However, district courts within our circuit have found that the specialized skill or distinctive knowledge was needful. *See, e.g., Lazli v. CIS*, No. 05-cv-1680-BR, 2007 WL 2156659 (D. Or. July 25, 2007).

some extraordinarily specialized skill in immigration law—was necessary for this litigation because it was not a typical immigration case. The government objects to this finding, arguing that "[n]ot unlike *Thangaraja*, this case involved the application of the immigration detention statutes, Supreme Court precedent, and an understanding of Constitutional law, but it turned on statutory interpretation. It did not involve the application of complex statutes or regulations." I agree with the government. At heart, this was a habeas corpus case, no more complex than most of our death penalty habeas corpus cases.

Our decision in *Nadarajah* required an understanding of the Tamil Tigers, and statutes and constitutional provisions governing detention. I remain unconvinced, however, that this case required such acute and specialized knowledge of detention and habeas corpus that it could be done by few other than these three attorneys.

## C. Availability of Other Counsel

The EAJA also requires that, for a fee enhancement based on this special factor, there must be a "limited availability of qualified attorneys for the proceedings involved." 28 U.S.C. § 2412(d)(1)(D)(2)(A). "[T]he burden rests on Plaintiffs to demonstrate their entitlement to higher fees" based on the unavailability of qualified counsel. *Winter*, 543 F.3d at 1161. In *Love*, we declined to decide the proper amount of attorneys' fees until "the district court [made] a further finding as to the availability of attorneys in the area with similar skills who would take the case at the statutory rate." 924 F.2d at 1496-97.

For Nadarajah, the majority relies on an affidavit from an immigration attorney in California, swearing that there are few lawyers in the country who could and would work on a case such as this; and none who would do it for the statutory maximum of $125 per hour. While the government fails to

make a meaningful objection to these statements,[3] I find the reasoning defective.

First, in one of our previous orders, we stated that California has an overwhelming number of immigration attorneys. *Freeman*, 2008 WL 1960838, at *6 ("The government's contention that Renison practices in California, *where this court has stated that there is no shortage of attorneys qualified to practice in immigration law*, is incorrect. Renison practices in Oregon.") (emphasis added).

Second, both *Freeman* and *Fang* focus on the fact that there were not qualified immigration attorneys in Oregon and Montana, respectively, so the adjustment was reasonable. As I read these cases, a significant factor is that the qualified attorney should be in reasonably close proximity to the client. In this case, one of the attorneys, Rabinovitz, actually practices in New York—some 2800 miles from the ACLU in Los Angeles, California, and even further from the location of Nadarajah's southern California detention. It is a bit hard to believe that there was no qualified attorney anywhere between the Pacific and Atlantic Oceans. Also, while attorneys Arulanantham and Natarajan both practice in Los Angeles, that is still some distance from where Nadarajah was actually detained in Otay Mesa, California—located about five miles from the United States border with Mexico.

There being "no shortage of attorneys qualified to practice immigration law" in California, juxtaposed with the fact that none of Nadarajah's attorneys are located close to him, I question the majority's conclusion that there was no qualified attorney able to represent Nadarajah at the statutorily imposed fee ceiling.

---

[3]The government simply objects to the Affidavit as a whole, without citing legal authority, because the affiant, Marc Van Der Hout, does not state whether he, or immigration practitioners in general, normally bill hourly or charge a flat fee.

### D. Prevailing Market Rate

While this is not a prong of the test we delineated in *Love*, the prevailing market rate is the amount to be applied if that test is satisfied. The EAJA states that "[t]he amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished . . . ," 28 U.S.C. § 2412(d)(1)(D)(2)(A), if there has been a fee enhancement due to a special factor. *See Blum v. Stenson*, 465 U.S. 886 (1984). The Court in *Blum* stated that the "prevailing market rate" is "governed by the same standards which prevail in other types of equally complex Federal litigation," and is based on "the customary fee for similar work in the community." *Id.* at 893-94 (internal citation and quotation marks omitted). It does not matter whether the attorneys are typically private or public-interest counsel. *See Sorenson v. Mink*, 239 F.3d 1140, 1145 (9th Cir. 2001) (quoting *Blum*, 465 U.S. at 895 ("fees are based on the 'prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel' "). The Supreme Court stated that, regarding the ACLU, "[i]t is in the interest of the public that such law firms be awarded reasonable attorneys' fees to be computed in the traditional manner when its counsel perform legal services otherwise entitling them to the award of attorneys' fees." *Blum*, 465 U.S. at 895 (quoting *Davis v. County of Los Angeles*, No. 73-63-WPG, 1974 WL 180 (C.D. Cal. June 5, 1974)).

Even though it makes no difference whether the client is represented by private or public interest counsel, a fee award under the EAJA should not result in a windfall for the attorneys. The majority determined the market rate by considering affidavits from both Rabinovitz and Arulanantham, as well as supplemental affidavits in support by other attorneys—Marc Van Der Hout, Carol Sobel, and Michael Lawson. It also compared the requested hourly rates to those of associates and partners at private firms like Loeb & Loeb, working in public

interest, and Skadden, Arps, Slate, Meagher & Flom, a large, private firm.

However, after this study, the majority concludes that Rabinovitz should be awarded a staggering $500 per hour, four times the statutory maximum to be awarded in EAJA cases. It also awards both Arulanantham and Natarajan $300 per hour for work in 2004, $315 per hour for 2005, and $335 per hour for 2006. While the award to the latter two attorneys was reduced by five percent, these amounts are still well in excess of what we pay attorneys in the most complex cases before this circuit—i.e., death penalty habeas litigation.

During the years Nadarajah was represented by Rabinovitz, Arulanantham, and Natarajan, our most complicated cases paid far less in hourly rates than these three attorneys are now awarded.[4] The maximum hourly fee permitted for capital habeas attorneys was $125 per hour in 2004, $160 per hour in 2005, and $163 per hour in 2006. These amounts, while higher than those permitted by the EAJA, still pale in comparison to the generous fees awarded today by the majority. I cannot join the majority opinion in approving this amount to Nadarajah's attorneys when equally competent attorneys working on our most difficult habeas corpus appeals were paid so much less for work which sometimes means the difference between life and death.

---

[4]The Criminal Justice Act ("CJA") provides attorney's fees for appointed federal criminal defense counsel in death penalty habeas appeals. *See* 18 U.S.C. §§ 3006A, 3599. Under the Antiterrorism and Death Penalty Act ("AEDPA"), 110 Stat. 1214, the court may appoint attorneys in death penalty habeas cases. *See* 28 U.S.C. §§ 2254, 2255. These attorneys are paid through funds allotted by the CJA, and the Judicial Conference has the power to determine the guidelines for the fee schedule. 18 U.S.C. § 3599(g)(1); *see also* 28 U.S.C. §§ 2254(h), 2255(g). The Judicial Conference may increase the maximum hourly payment based on the adjustments to rates of pay within the General Schedule. *See* 5 U.S.C. § 5305, 18 U.S.C. § 3599(g). The Judicial Council of the Ninth Circuit then releases an annual policy incorporating those capital habeas rates in our circuit.

## III.   Conclusion

The EAJA was enacted to "level the playing field" when a private individual successfully disputes governmental action. Testimony of Sen. Russ Feingold, 151 Cong. Rec. S12950-02, 2005 WL 3071105, at *S12951 (Nov. 16, 2005). The "EAJA acknowledges that the resources available to the Federal Government in a legal dispute far outweigh those available to most Americans." *Id.* However, when it enacted EAJA, Congress capped that rate at $125 per hour as the legislative determination of the amount which properly compensates attorneys who provide such legal assistance, unless there is some "special factor" leading to a fee enhancement. I believe we should find these "special factors" in the rare instance, where they are warranted by complex case material, specialized attorney skill, or where there is a documented inability to find willing counsel at the statutory rate. Because the amounts awarded here are substantially in excess of reasonable hourly rates Congress says we may pay comparable habeas corpus counsel in complex death penalty litigation, I respectfully dissent from the excessive rates approved today for Nadarajah's immigration attorneys.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.