CATHOLIC SOCIAL SERVICES, INC.,—Immigration Program, et al., Plaintiffs,

v.

Janet NAPOLITANO, Secretary U.S. Department of Homeland Security, et al., Defendants.

No. CIV.S–86–1343 LKK/JFM.

United States District Court, E.D. California.

Nov. 15, 2011.

Luis Alfonso Cespedes, Law Offices of Luis Alfonso Cespedes, Sacramento, CA, Michael Rubin, Altshuler Berzon LLP, San Francisco, CA, Robert H. Gibbs, Robert Pauw, Gibbs Houston Pauw, Seattle, WA, Stephen Allen Rosenbaum, Protection and Advocacy Inc., Oakland, CA, for Plaintiffs.

Andrew C. MacLachlan, Earle B. Wilson, Department of Justice, Washington, DC, Glyndell E. Williams, United States Attorney, Sacramento, CA, for Defendants.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

This class action addressed the Immigration and Naturalization Service's improper decision to turn away certain applicants for legalization during a one-year period from 1987 to 1988. The court approved the parties' settlement agreement in January 2004. On December 14, 2009, 2009 WL 4928377, the court issued an order that, *inter alia,* granted plaintiffs' motion to enforce the settlement agreement because the defendants had relied upon a 1991 abandonment regulation to deny the legalization applications of some

class members, in violation of the settlement.

Now before the court is plaintiffs' motion for attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), for the fees and costs incurred in prosecuting their motion to enforce and their work related to post-judgment monitoring and enforcement of the settlement agreement.

## I. BACKGROUND

### A. Initial Class Action Complaint

On November 12, 1986, plaintiffs filed a class action complaint challenging an Immigration and Naturalization Service ("INS")[1] regulation implementing a provision of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. 99–603, 100 Stat. 3359, *codified* at 8 U.S.C. §§ 1255a *et seq.* (1986), which allowed immigrants who had been in the United States unlawfully since January 1, 1982 to apply for adjustment of status during a specified twelve-month period. *See* 8 U.S.C. § 1255a(a)(2)(A). IRCA directed the Attorney General to grant a stay of deportation and to issue interim work authorization to immigrants who could establish a prima facie case of eligibility in his or her application for adjustment of status under IRCA. *See* 8 U.S.C. § 1255a(e)(2).

While IRCA required immigrants to be able to show that they had been continuously physically present in the United States since November 6, 1986, *see* 8 U.S.C. § 1255a(a)(3)(A), the statute also stated that "[a]n alien shall not be considered to have failed to maintain continuous physical presence in the United States ... by virtue of brief, casual and innocent absences." 8 U.S.C. § 1255a(a)(3)(B). The

INS subsequently issued a regulation that provided that:

> *Brief, casual,* and *innocent* means a departure authorized by the Service (advance parole) subsequent to May 1, 1987 of not more than thirty days for legitimate emergency or humanitarian purposes unless a further period of authorized departure has been granted in the discretion of the district director or a departure was beyond the alien's control.

8 C.F.R. § 245a.1(g) (emphasis in original).

In 1988, this court held that IRCA's "continuous physical presence" requirement was met for those applicants who had "brief, casual, and innocent" absences from the country without prior INS approval and, thus, the INS's regulation interpreting the statute was invalid. *See Catholic Soc. Serv., Inc. v. Meese,* 685 F.Supp. 1149 (E.D.Cal.1988). The government did not appeal the ruling on the merits. The government did, however, appeal this court's subsequent remedial orders that, *inter alia,* extended the application period for the plaintiff class; mandated procedures for determining whether an immigrant was covered by the injunction; and provided that plaintiffs who could show prima facie eligibility for legalization were entitled to stays of deportation, release from custody, and temporary employment authorization. *See, e.g., Catholic Soc. Serv., Inc. v. Thornburgh,* 956 F.2d 914 (9th Cir.1992); *Reno v. Catholic Soc. Serv., Inc.,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993); *Catholic Soc. Serv., Inc. v. Reno,* 134 F.3d 921 (9th Cir.1997); *Catholic Soc. Serv., Inc. v. I.N.S.,* 182 F.3d 1053 (9th Cir.1999).

---

1. The INS was the predecessor to the U.S. Citizenship and Immigration Service ("CIS"), among other agencies.

## B. Settlement of Class Action

The parties entered a settlement that was approved on January 23, 2004, 2004 WL 5716141. Order Approving Settlement Class Action, ECF No. 656 (Jan. 23, 2004).[2]

The settlement set forth a process for determining whether an individual was a member of the plaintiff class, under which the individual was required to submit an application for class membership and an application for status as a temporary resident, with supporting documentation, to the defendants within a one-year period. Joint Mot., Doc. 650, Att. 1, at ¶ 4 (Dec. 1, 2003). The defendants were required to grant class membership applications where "it appear[ed] more probable than not that the applicant [met] the class definition." Id. at ¶ 6.

Before denying the application, the defendants were to forward to the applicant or his or her representative "a notice of intended denial explaining the perceived deficiency in" the application for class membership, after which, the applicant had thirty days to submit additional evidence or otherwise remedy the deficiency. Id. at ¶ 7. If, following the above protocol, the application was denied, the defendants were required to send a copy of the notice of denial to the applicant, his or her attorney, and class counsel and inform the ap-

plicant of his or her right to appeal the denial to a special master. Id. at ¶ 8.

If, however, the application was granted, the defendants were required to adjudicate the class member's application for temporary residence as if it were timely filed between May 5, 1987 and May 4, 1988. Id. at ¶ 11. The settlement agreement provided:

> The Defendants shall adjudicate each application for temporary residence filed on Form I–687 in accordance with the provisions of section 245A of the Immigration and Nationality Act, 8 U.S.C. § 1255a, regulations, and administrative and judicial precedents the INS followed in adjudicating I687 applications timely filed during the IRCA application period.

Id.

## C. Initial Settlement for Attorney's Fees and Costs

In March 2004, the parties agreed to settle plaintiffs' claims for attorney's fees and costs incurred in the action. Stipulation, ECF No. 659 (March 5, 2004). This court's order thereon stated, inter alia, "Defendants will pay Plaintiffs $3,500,000 in full settlement of all claims they may have for attorneys' fees, whether under the Equal Access to Justice Act ("EAJA"),

---

**2.** The settlement defined the plaintiff class entitled to relief as:

A. All persons who were otherwise prima facie eligible for legalization under section 245A of the INA and who tendered completed applications for legalization under section 245A of the INA and fees to an INS officer or agent acting on behalf of the INS, including a QDE, during the period from May 5, 1987 to May 4, 1988, and whose applications were rejected for filing because an INS officer or QDE concluded that they had traveled outside the United States after November 6, 1986 without advance parole. All persons who filed for class membership under Catholic Soc. Serv., Inc. v. Reno, No.

Civ. S–86–1343 LKK (E.D.Cal.), and who were otherwise prima facie eligible for legalization under Section 245A of the INA, who, because an INS officer or QDE concluded that they had traveled outside the United States after November 6, 1986 without advance parole were informed that they were ineligible for legalization, or were refused by the INS or its QDEs legalization forms, and for whom such information, or inability to obtain the required application forms, was a substantial cause of their failure to timely file or complete a written application.

Joint Mot., Doc. 650, Att. 1 (Dec. 1, 2003).

or otherwise, and $100,000 in full settlement of all claims they may have for costs." *Id.* at 3. The order also provided, "such payment will release Defendants from all payment obligations to Plaintiffs under EAJA and any other applicable law or regulation." *Id.*

### D. Motion to Enforce the Class Action Settlement Agreement

In October 2009, plaintiffs filed a motion to enforce the settlement, arguing that: (1) defendants had been applying an abandonment regulation that was enacted in 1991 to terminate class members' applications for temporary residence when applicants had failed to provide supplemental evidence after the government had requested they do so; and (2) defendants had declined to consider applications for class membership by applicants residing abroad and had failed to notify those applicants of their right to appeal a decision denying their applications for class membership to a special master. Pls' Mot., ECF No. 671 (Oct. 12, 2009).

In their opposition to plaintiff's first argument, defendants argued, *inter alia,* that: (1) the settlement agreement was silent as to how CIS should treat abandoned applications for class membership or subsequent applications for legalization and it was therefore not unreasonable for current CIS officers to look to the current abandonment regulation in determining how to adjudicate those applications; (2) the abandonment regulations were promulgated, in part, because "some applicants for immigration benefits would file skeletal or unapprovable benefit applications simply to gain interim benefits, or to establish a priority place in line," "there was rampant fraud by people who prepared class membership applications," and "many fraudulent applications would later be abandoned"; and (3) the abandonment regulation "provide[d] the skeletal applicant more protection, and more procedural

due process, than was available to a legalization applicant in the 1980's, not less." *See* Defs.' Opp'n, ECF No. 674, at 2–18 (Nov. 16, 2009).

As to the plaintiff's first argument, this court determined that defendants had "refus[ed] to implement the relief set forth in the settlement agreement" by engaging in a "pattern and practice of applying the 1991 abandonment ... regulations to the legalization applications of plaintiffs," even though the settlement had "expressly require[d] that defendants may only use regulations in effect while applications filed during the 1987–1988 application period were adjudicated when adjudicating class member applications." Order, ECF No. 678, at 7, 9 (Dec. 14, 2009). This court went on to state that it could not "envision any reasonable interpretation of paragraph 11 [of the settlement agreement] that would allow defendants to apply a regulation not in effect during the 1987–1988 period." *Id.* at 9.

With regard to the plaintiff's second argument, this court found that plaintiffs had "not identified any claims ripe for judicial review" and, thus, the court could not decide "whether applications of individuals living abroad should be adjudicated by US-CIS." *Id.* at 13. However, the court determined that plaintiffs had "identified a pattern and practice of failure to comply with the terms of the settlement" because they had "provided two notices of decision from USCIS declining to consider applications for class membership of individuals residing abroad" and "[n]either notice [had] notifie[d] the applicant of his or her right to seek review of the denial by a special master," in violation of the settlement agreement. *Id.* Recognizing their failure to conform with the terms of the settlement agreement, during oral argument on the motion to enforce, defendants' counsel informed the court that defendants had identified all individuals who had ap-

plied for class membership from abroad and that defendants were in the process of advising these applicants of their right to appeal to the special master. *See id.;* Tr. Proceedings, ECF No. 679, at 20 (Dec. 15, 2009).

In May 2010, after a series of negotiations, this court resolved the parties' conflicting proposals for remedial plans concerning the applications deemed abandoned and those from abroad, and provided that: (1) class members would have ninety days from the date notice was mailed of the amended notice of denial to appeal to the administrative appeals office; (2) the agency, where possible, would refund the required fee for unnecessary motions to reopen by virtue of declared abandonment, or credit such fees towards the fee for filing an administrative appeal at the class members' option; (3) review of the appeals would be on the merits; and (4) the CIS would accept a filing fee as it existed in 2004–2005. Order, ECF No. 696 (May 18, 2010).[3]

### E. Motion for Attorney's Fees

Before the court is Plaintiffs' motion for attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), for the fees and costs incurred in prosecuting their motion to enforce and for their work related to the post-judgment enforcement of the settlement agreement. Pls' Mot., ECF No. 681 (Jan. 13, 2010).

Although plaintiffs, in their motion for attorney's fees, assert that they are "enti-tled to recover attorney's fees and costs for all post-settlement monitoring and not only work directly associated with the motion to enforce," *id.* at 2 n. 3, in their reply to the defendant's opposition, plaintiffs acknowledge that, "Although plaintiffs *could* have sought fees for general monitoring of the settlement . . . they seek fees only for work specifically related to enforcing the settlement." Pls' Reply, ECF No. 705, at 1 n. 1. This court therefore interprets plaintiffs' motion as a request for fees and costs confined to plaintiffs' work specifically related to enforcing the settlement.

Plaintiffs have calculated their fees under the EAJA by multiplying their assessment of the inflation-adjusted EAJA hourly rate by the hours they spent both prosecuting the motion to enforce CIS's compliance with the settlement and preparing the instant EAJA motion (but deducting hours that were poorly documented, excessive, the result of overstaffing, or not directly related to prosecution of the enforcement motion), yielding an initial request by the plaintiffs for $51,187.93 under the statute. Decl. Counsel, ECF No. 713, at Ex. B. Plaintiffs also seek an enhanced fee award, calculated at $500 per hour, based on their particular "distinctive knowledge and specialized skill," yielding an enhanced request for $143,625. Consolidated Index, ECF No. 707, at Ex. P. Additionally, plaintiffs seek the award of costs for "fees and other expenses" under the EAJA, in accordance with plaintiffs' bill of costs, in the amount of $2,033.27. *Id.* at Ex. O.

---

**3.** In the order resolving the parties' conflicting proposals for remedial plans, this court stated:

Two conflicting values are at stake. On the one hand, is the imperative of due process which strongly suggests that applicants not be deprived of the opportunity to apply for the benefits acquired in the settlement agreement in the instant case by virtue of the government's conduct, which the court previously determined was inconsistent with the decree. On the other hand, in the real world in which cases must, at some point, end and allow the government and the people to get on to other matters. The court must be frank, in some ways there simply is no "right" answer.

Order, ECF No. 696, at 1–2.

## II. STANDARD FOR MOTION FOR ATTORNEY'S FEES AND COSTS

Under the Equal Access to Justice Act ("EAJA"), a court "shall award" attorney fees, costs and other expenses to a "prevailing party" in "any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A) (2011).

■ Because the EAJA partially waives the sovereign immunity of the United States and created a limited, precisely-defined class of adjudications in which an award of attorney's fees is allowed, the EAJA's waiver must be strictly construed. *W. Watersheds Project v. Interior Bd. of Land Appeals*, 624 F.3d 983, 989 (9th Cir. 2010).

■ For the court to award attorney's fees and costs under the EAJA, it must be shown that (1) the party seeking fees is the prevailing party; (2) the government has not met its burden of showing that its positions were substantially justified or that special circumstances make an award unjust; and (3) the requested fees and costs are reasonable. *United States v. Milner*, 583 F.3d 1174, 1196 (9th Cir.2009) (citing *Perez–Arellano v. Smith*, 279 F.3d 791, 793 (9th Cir.2002)).

## III. ANALYSIS

### A. Prevailing Party

#### 1. Availability of EAJA Fee Awards for Monitoring and Enforcement of a Settlement Agreement

■ As a preliminary matter, defendants argue that plaintiffs are not eligible

for attorney's fees and costs because "Plaintiffs' class counsel already received fees for the earlier phases of this litigation .... [and they] are not entitled to a double dip of fees under the EAJA." Defs' Opp'n, ECF No. 703, at 2 (Aug. 15, 2011).

■ It is firmly within the district court's discretion to determine whether a party's attorney's fees for post-judgment proceedings should be compensable under the EAJA. *See Bullfrog Films, Inc. v. Wick*, 959 F.2d 782, 786 (9th Cir.1992).

In *Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), the plaintiff first obtained relief in the form of a consent decree and later participated in administrative proceedings and substantial further litigation to protect that relief. The Supreme Court held that "participation in these administrative proceedings was crucial to the vindication of Delaware Valley's rights under the consent decree and [found] that compensation for these activities was entirely proper and well within the 'zone of discretion' afforded the District Court." *Delaware Valley*, 478 U.S. at 561, 106 S.Ct. at 3096 (internal citation omitted).

Similarly, in *Keith v. Volpe*, 833 F.2d 850 (9th Cir.1987), the plaintiff applied for supplemental fees for monitoring compliance with a consent decree, even though the parties had previously stipulated to a fee award for the plaintiff's counsel's work leading up to, and implementing, the consent decree. The Ninth Circuit held that "the district court here 'was entitled to believe that relief [for the plaintiffs under the consent decree] would occur more speedily and reliably' if the [plaintiffs] engaged in these monitoring activities, and this post-judgment monitoring by the [plaintiffs] was, therefore, 'a necessary aspect of plaintiffs' 'prevailing' in the case.' " *Keith*, 833 F.2d at 857, quoting *Garrity v.*

*Sununu,* 752 F.2d 727, 738–39 (1st Cir. 1984).[4]

In this case, under the terms of the settlement agreement, the defendants were prescribed a set of conditions and procedures for CIS's future acceptance, evaluation, and denial of claims for class membership. The fact that defendants were required to engage in ongoing future activities to comply with the settlement agreement, by necessity, meant that both the parties and this court contemplated further activity by the plaintiffs in monitoring the defendants' activities, to some extent, to ensure that the defendants were acting in compliance with the settlement terms.[5]

The defendants failed to abide by the letter of the settlement agreement when they impermissibly applied their 1991 abandonment regulations in the adjudication of class members' claims and declined to consider applications for class membership of individuals residing abroad and failed to notify those applicants of their right to appeal, which required the plaintiffs to take active and affirmative steps to enforce the settlement agreement. The defendants' failure to adhere to the terms of the settlement requirements continued until the resolution of the plaintiffs' motion to enforce.

It is therefore clear that the plaintiffs' litigation of their motion to enforce was "crucial to the vindication of [their] rights" under the settlement agreement, *see* 478 U.S. at 561, 106 S.Ct. at 3096, and their affirmative enforcement activities were a "necessary aspect" of their prevailing in the case, *see* 833 F.2d at 857.

The plaintiffs are therefore not precluded from recovering attorney's fees and costs for work performed subsequent to the settlement agreement. Plaintiffs are still required to show, however, that they have met the requirements for a fee award under the EAJA.

**2. Prevailing Party**

■ A plaintiff is a "prevailing party" for purposes of the EAJA if he or she "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *See United States v. Real Property Known as 22249 Dolorosa Street,* 190 F.3d 977, 981 (9th Cir.1999) (internal citations and quota-

---

**4.** Although *Delaware Valley* and *Keith* both addressed whether or not attorney fee awards were available for post-judgment proceedings under the Civil Rights Attorney's Fees Awards Act of 1976 ("CRAFA"), the Ninth Circuit has stated that it "cannot distinguish [CRAFA] from the [EAJA] for the purposes of defining 'prevailing party,'" *Bullfrog Films,* 959 F.2d at 786 n. 5 (citing *United States v. Buel,* 765 F.2d 766, 767 (9th Cir.1985)).

**5.** If the defendants had, in actuality, complied with the explicit terms of the settlement agreement, the plaintiffs may have been precluded from receiving post-settlement fees for general monitoring of the settlement agreement by the terms of this court's March 2004 order, which stated that the plaintiffs' agreed-upon fee at that time was "in full settlement of all claims they may have for attorneys' fees, whether under the Equal Access to Justice Act

("EAJA"), or otherwise." *See Alliance to End Repression v. City of Chicago,* 356 F.3d 767, 770–71 (7th Cir.2004) (noting that *Keith,* among other cases, is "best explained on a deterrence rationale: careful monitoring reduces the likelihood that the decree will be violated," but that, following the Supreme Court's ruling in *Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), "[m]onitoring may reduce the incidence of violations of a decree, but if it does not produce a judgment or order, then ... it is not compensable.") However, because the defendants did not comply with the explicit terms of the settlement, and the plaintiffs are not seeking fees for general monitoring of the settlement agreement, *Buckhannon's* limitation does not apply to this case.

tion marks omitted). The plaintiff's success must not solely derive from the defendant's voluntary cessation of its conduct. *Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of Health,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Instead, there must be a "judicial imprimatur" that changes the legal relationship of the parties. *Watson v. County of Riverside,* 300 F.3d 1092, 1096 (9th Cir. 2002).

The Supreme Court has provided two examples of forms of relief that justify a fee award: enforceable judgments on the merits and settlement agreements enforced through a consent decree. *Buckhannon,* 532 U.S. at 604–05, 121 S.Ct. 1835. The Ninth Circuit has also found a legally enforceable settlement agreement between the plaintiff and defendant to qualify the plaintiff as a prevailing party. *See Richard S. v. Dep't of Developmental Services of Cal.,* 317 F.3d 1080, 1086 (9th Cir.2003).

■ In the class action at hand, when this court approved the parties' settlement agreement in January 2004, the plaintiffs were a "prevailing party" for EAJA purposes because the legally enforceable settlement agreement required the defendants to revisit applications for legalization that had previously been discouraged, refused, or denied. The plaintiffs, by both invalidating the INS's interpretation of "brief, casual and innocent absences" under IRCA, and requiring the agency to re-evaluate individual claims, therefore succeeded on a significant issue in litigation which achieved the benefit they sought in bringing suit. Because the defendants were required by the court-approved settlement to take remedial steps that they would not have otherwise taken, there was a "judicial imprimatur" that changed the legal relationship and obligations of the parties and the plaintiffs' success in the suit did not derive from the defendants'

voluntary cessation of the conduct. Indeed, both parties likely recognized the plaintiffs' status as a prevailing party, and the plaintiffs' potential eligibility for fee awards under the EAJA when they stipulated, in March 2004, to a settlement of the plaintiffs' claims under the EAJA.

Because plaintiffs were a "prevailing party" as of the settlement agreement, and their post-settlement enforcement activities were a "necessary aspect" of their prevailing in the case, *see Keith,* 833 F.2d at 857, this court need not consider whether plaintiffs were a "prevailing party" in their motion to enforce. *See Gates v. Gomez,* 60 F.3d 525, 534 (9th Cir.1995) (defendants "urge us to apply a prevailing party standard under 42 U.S.C. § 1988 to post-judgment monitoring and compliance work under the consent decree. But plaintiffs have already met the section 1988 prevailing party standard with the entry of the consent decree."). Regardless, defendants have stated that they "do not contend that Plaintiffs did not prevail upon their Motion to Enforce." Defs' Opp'n, ECF No. 703, at 6.

This court therefore finds that plaintiffs have satisfied the "prevailing party" requirement of the EAJA.

**3. Net Worth Requirements**

An eligible "party" for a fee award under the Equal Access to Justice Act ("EAJA"), must be, *inter alia,* an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed. 28 U.S.C. § 2412(d)(2)(B)(i).

Plaintiffs have submitted evidence demonstrating that the movant plaintiff class members are indigent and therefore fall under the maximum net worth requirements under the EAJA. Pls' Mot., ECF No. 681, at 11–12; Pls' Decl. Ruben Sandoval, Ex. A; Decl. of Mohani Singh, Ex. B; Decl. Lucilda Knox, Ex. C. Defendants do not contest the assertion that plaintiff class

members are indigent, nor do they contest the evidence submitted thereon.

This court therefore finds that plaintiffs have met the net worth requirements under the EAJA.

## B. Substantial Justification for Defendants' Position

■ Under the EAJA, the government bears the burden of showing that its position was substantially justified in law and in fact. *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 498 (9th Cir. 1987). That is, "the government's position must have a reasonable basis in law and fact." *Shafer v. Astrue,* 518 F.3d 1067, 1071 (9th Cir.2008) (internal citations omitted). Put another way, "substantially justified" means there is a dispute over which reasonable minds could differ. *Gonzales v. Free Speech Coalition,* 408 F.3d 613, 618 (9th Cir.2005). For example, an agency's position is not substantially justified when it is based on violations of the Constitution, a federal statute, or the agency's own regulations. *Mendenhall v. National Transp. Safety Bd.,* 92 F.3d 871, 874 (9th Cir.1996).

■ There is conflicting guidance within the Ninth Circuit as to whether a district court should evaluate the government's position as a whole, or its position at each discrete stage of litigation in question, when deciding if the government has met its burden of showing that its position was substantially justified.

On the one hand, the Ninth Circuit has provided that in determining fee eligibility

under the EAJA, a court should treat a case as an inclusive whole, rather than as atomized line-items. *In re Southern California Sunbelt Developers, Inc.,* 608 F.3d 456, 463 (9th Cir.2010) (citing *Commissioner, I.N.S. v. Jean,* 496 U.S. 154, 161–62, 110 S.Ct. 2316, 2320, 110 L.Ed.2d 134 (1990)); *see also Al–Harbi v. I.N.S.,* 284 F.3d 1080, 1084 (9th Cir.2002) ("In making a determination of substantial justification, the court must consider the reasonableness of both the underlying government action at issue and the position asserted by the government in defending the validity of the action in court." (internal quotation marks and citations omitted)); *Gutierrez v. Barnhart,* 274 F.3d 1255, 1259 (9th Cir.2001) ("The district court erred in not addressing the reasonableness of the underlying [agency] conduct and basing its denial of fees solely on the government's litigation position."). Bolstering this interpretation of the "substantial justification" requirement is the Supreme Court's holding that "[t]he single finding that the Government's position lacks substantial justification, like the determination that a claimant is a 'prevailing party,' thus operates as a one-time threshold for fee eligibility," even "[w]hile the parties' postures on individual matters" within any given civil action "may be more or less justified." *Commissioner, I.N.S.,* 496 U.S. at 160–61, 110 S.Ct. at 2320.

Evaluating this class action as an inclusive whole, this court finds that the government's position lacks substantial justification.[6] In this court's 1988 opinion

---

6. Defendants make no arguments that their position in the case as a whole was substantially justified. Instead, defendants provide: This Court should not look at Defendants' pre-litigation position to determine substantial justification for proceedings under the Settlement Agreement. That dispute was settled, and class counsel received fees for the litigation leading to the Settlement Agreement.... This Court should ... evaluate whether defendants' opposition to Plain-

tiffs' Motion to Enforce was substantially justified.
Defs' Opp'n to Pls' Mot. for Att'y Fees, ECF No. 703, at 5. If this court is to treat the class action as an inclusive whole in determining whether the government's position was substantially justified, the defendants' failure to make arguments regarding their position prior to plaintiffs' motion to enforce indicates that defendants have failed to meet their burden of showing that the government's position

invalidating the original INS regulation at issue, this court concluded that the INS's regulation "simply finds no support in the text of [IRCA]"; that "[a]ny possible reading of the Attorney General's final regulation leads to a result that is inconsistent with the Congressional purpose"; that, of two possible interpretations of the regulations, "[n]either ... is consistent with the plain language of the statute"; that "the Attorney General's regulation is not only inconsistent with the department's previous understanding of the ["brief, casual, and innocent"] language, it in effect sought to limit the meaning of the phrase, a result which Congress had rejected"; and that "the INS has not interpreted the phrase consistently throughout the statutory scheme." *Catholic Soc. Serv., Inc. v. Meese*, 685 F.Supp. 1149, 1155–57 (1988). Because the INS's interpretation of "brief, casual, and innocent" was contrary to the text, intent, and plain language of a federal statute, in addition to being contrary to the agency's own previous understanding and alternative usage of the phrase, reasonable minds could not differ in their assessment that the government's underlying conduct in this case was not substantially justified. Thus, under this theory, defendant's conduct in the case as an inclusive whole was not substantially justified. *See Commissioner, I.N.S.*, 496 U.S. at 160–61, 110 S.Ct. at 2320.

On the other hand, however, the Ninth Circuit has also noted that after the Supreme Court's decision in *Shalala v. Schaefer*, 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993), when it "became possible for a claimant to be deemed a 'prevailing party' for EAJA purposes prior to the ultimate disposition of his disability claim," a "shift occurred within the circuit to con-

sidering the justification of the government's position at the discrete stage in question." *Corbin v. Apfel*, 149 F.3d 1051, 1053 (9th Cir.1998). That is, after *Shalala v. Schaefer*, the Ninth Circuit began requiring that the "government's position at each stage ... be 'substantially justified.'" *Id.; see also Shafer*, 518 F.3d at 1071 (finding that where an ALJ's decision was reversed on the basis of procedural errors, the relevant question was whether the government's decision to defend on appeal the procedural errors committed by the ALJ was substantially justified).

Evaluating whether defendants' position after the settlement agreement and through the litigation of the plaintiffs' motion to enforce was substantially justified, the court finds that the defendants' position lacks substantial justification. After the settlement agreement, this court found that defendants had engaged in a "pattern and practice of applying their 1991 abandonment ... regulations to the legalization applications of plaintiffs," in direct contravention of the explicit requirements of the settlement agreement. *See* Order, ECF No. 678, at 7, 9 (Dec. 14, 2009). Indeed, the court explained that it could not "envision any reasonable interpretation of paragraph 11 [of the settlement agreement] that would allow defendants to apply a regulation not in effect during the 1987–1988 period." *Id.* at 9. Defendants had also failed to comply with the terms of the settlement agreement by "declining to consider applications for class membership of individuals residing abroad" and by failing to notify the foreign applicant of his or her right to appeal. *Id.* at 13. The court continues to find the government's contravention of the express terms of their agreed-upon settlement patently unreasonable, and thus, defendants' conduct following the settlement agreement was not substantially justified.[7,8] Because it was

---

throughout the class action as a whole has been substantially justified.

7. Defendants argue that, because plaintiffs failed to assert that the government's position

unreasonable for defendants to apply regulations and policies in contravention of the terms of the settlement agreement, this court cannot find that the position asserted by the government in defending the validity of those post-settlement actions in court was reasonable. *See Flores v. Shalala*, 49 F.3d 562, 570 n. 11 (9th Cir.1995) ("It is difficult to imagine any circumstance in which the government's decision to defend its actions in court would be substantially justified, but the underlying administrative decision would not.").

Thus, the government has failed to meet its burden of showing that its positions were substantially justified.

## C. Injustice of Awarding Fees

A prevailing plaintiff should ordinarily recover attorneys' fees unless special circumstances would render such an award unjust. 28 U.S.C. § 2412(d)(1)(A). Defendants make no argument that, due to special circumstances, an award of attorney's fees in this case would be unjust.

This court, therefore, does not find that any special circumstances exist that would make an EAJA award in this case unjust.

## D. Calculation of a Reasonable Fee

■ Although eligibility for fees is established upon meeting the conditions set out by the EAJA, the district court has substantial discretion in fixing the amount of an EAJA award. *Commissioner, I.N.S.*, 496 U.S. at 163, 110 S.Ct. 2316.

■ Under the EAJA, a district court's award of attorney fees must be "reasonable" and the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Sorenson v. Mink*, 239 F.3d 1140, 1145 (9th Cir.2001).

Attorney fees under the EAJA are capped by Congress. Until March 29, 1996, the statute provided that "attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor ... justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A) (1994). Although, on March 29, 1996, the statute was amended to increase the maximum fee to $125 per hour, plus any "cost of living" and

---

as to foreign filers lacked substantial justification, plaintiffs waive that argument in the motion before the court. This argument fails. Under the EAJA, the government bears the burden of showing that its position was substantially justified. *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 498 (9th Cir.1987).

8. To support their claim that defendants' post-settlement position was substantially justified, defendants point to the language of this court's May 2010 order resolving the parties' conflicting proposals for remedial plans. Defs' Opp'n to Pls' Mot. for Att'y Fees, ECF No. 703, at 7. In the order, this court noted that:

> Two conflicting values are at stake. On the one hand, is the imperative of due process

which strongly suggests that applicants not be deprived of the opportunity to apply for the benefits acquired in the settlement agreement in the instant case by virtue of the government's conduct, which the court previously determined was inconsistent with the decree. On the other hand, in the real world in which cases must, at some point, end and allow the government and the people to get on to other matters. The court must be frank, in some ways there simply is no "right" answer.

Order, ECF No. 696, at 1–2. However, in acknowledging the real-world constraints faced by the government, this court was not stating that it was reasonable for CIS to fail to comply with the express terms of the settlement agreement.

"special factor" adjustments, the $125 per hour cap only applies to cases commenced on or after March 29, 1996. *Sorenson*, 239 F.3d at 1145 (citing Contract with America Advancement Act of 1996, Pub.L. 104–121, 110 Stat. 847, 863, §§ 232(b)(1), 233 (1996)).

 Because this class action commenced in November of 1986, the applicable hourly fee under the EAJA is $75 per hour. However, the EAJA provides that the hourly rate should be increased where "an increase in the cost of living ... justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). The Ninth Circuit has provided that, except in unusual circumstances, a cost of living increase should be granted to adjust for inflation. *See Animal Lovers Vol. Assn. v. Carlucci*, 867 F.2d 1224, 1227 (9th Cir.1989). Defendants identify no such "unusual circumstances" that would make an inflation adjustment inappropriate in this case. This court will therefore calculate the plaintiffs' attorneys fees with the inflation adjustment.

 Cost-of-living increases are calculated by multiplying the statutory maximum hourly rate by the annual average consumer price index figure for all urban consumers ("CPI–U") for the years in which the attorney's work was performed and dividing by the CPI–U figure for the effective date of the statutory maximum hourly rate (using the CPI–U rate from October 1981 for pre-amendment cases). *Nadarajah v. Holder*, 569 F.3d 906, 918 (9th Cir.2009); *Ramon–Sepulveda v. I.N.S.*, 863 F.2d 1458, 1463 (9th Cir.1988).

According to the given formula, the court calculates the cost-of-living increase as follows: pre–1996 EAJA statutory maximum hourly rate ($75/hour); multiplied by

the CPI–U for the years in which the attorneys' work was performed, *see* United States Dep't of Labor, Bureau of Labor Statistics, Consumer Price Index, http://www.bls.gov/cpi/tables.htm (last visited Sept. 22, 2011); divided by the CPI–U rate from October 1981.[9] Because the average annual CPI–U figure is not yet available for 2011, the attorney hours submitted to this court for 2011 are computed at the CPI–U rate for the month in which those hours were performed. Thus, under the EAJA hourly rate plus the inflation adjustment, plaintiffs' attorneys are entitled to $172.85/hour for work performed in 2008; $172.24/hour for work performed in 2009; $175.66/hour for work performed in 2010; $180.56/hour for work performed in April 2011; $181.22/hour for work performed in June 2011; and $181.88/hour for work performed in August 2011. *See* Decl. Carlos Holguin re: Updated EAJA Loadstar Calculation, ECF No. 713, at Ex. B.

 Defendants argue that plaintiffs' calculation of hours for attorney fees should be "reduced by at least half" because plaintiffs "have not made any argument that Defendants' position was not substantially justified as to foreign filers." Defs' Opp'n, ECF No. 703, at 13. This argument fails. It was the defendants' burden to show that their position was substantially justified, *see Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 498 (9th Cir.1987); the plaintiffs were not required to make such an argument in order to prove their eligibility for a fee award under the EAJA. This court, therefore, finds it unnecessary to reduce plaintiffs' calculation of hours.

Multiplying the above inflation-adjusted EAJA hourly rates by the 295.55 work

---

9. Defendants are correct in arguing that plaintiffs may not calculate all of their hours at 2009 rates. The court, instead, calculates the cost-of-living adjustment according to the CPI–U for the year in which the fees were earned. *See Sorenson v. Mink*, 239 F.3d 1140, 1149 (2001).

hours performed by plaintiffs' counsel yields a total attorney fee award of $51,187.93. *See* Decl. Carlos Holguin, ECF No. 713, at 8.

### 1. Special Factor Enhancement:

■■■ Plaintiffs seek an enhanced fee award, calculated at $500 per hour, based on their particular "distinctive knowledge and specialized skill." Pls' Mot., ECF No. 681, at 11–12.

Enhanced hourly rates based on the special factor of the limited availability of qualified attorneys for the proceedings involved may be awarded under EAJA where the attorneys possess "distinctive knowledge" and "specialized skill" that was "needful to the litigation in question" and "not available elsewhere at the statutory rate." *See Nadarajah v. Holder,* 569 F.3d 906, 912 (9th Cir.2009); *Thangaraja v. Gonzales,* 428 F.3d 870, 876 (9th Cir.2005); *Love v. Reilly,* 924 F.2d 1492, 1498 (9th Cir.1991); *see also Pierce v. Underwood,* 487 U.S. 552, 572, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) ("Examples ... would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language.").

Plaintiffs argue that they should be compensated at the rate of $500 per hour—the same rate that a specialized immigration attorney received in *Nadarajah.*

### a. Distinctive Knowledge and Specialized Skill Needful to the Litigation in Question:

■■■ Expertise in immigration law, by itself, is not sufficient to justify the award of enhanced hourly rates. *Nadarajah,* 569 F.3d at 913 (citing *Thangaraja,* 428 F.3d at 876; *Perales v. Casillas,* 950 F.2d 1066, 1078–79 (5th Cir.1992)). However, enhanced rates have been awarded in immigration cases where counsel established that "knowledge of foreign cultures or of particular esoteric nooks and crannies of immigration law ... [was] needed to give the alien a fair shot at prevailing." *Thangaraja,* 428 F.3d at 876.

Plaintiffs submit declarations in support of their assertion that they possess expertise in the particularly specialized areas of immigration law that were required to give the plaintiff class a fair shot at prevailing in the litigation at hand.

In the declaration of Judy London, Directing Attorney of Public Counsel's Immigrants' Rights Project, London asserts that "Messrs. Schey and Holguin are among the leading immigrants' rights lawyers in the country and are recognized as the experts on the rights of legalization applicants." Decl. Judy London, ECF No. 715 (Oct. 4, 2011), at 4. London also provides that "Messrs. Holguin and Schey possess specialized knowledge of immigration law, as well as even more rarified knowledge of the law affecting immigrants under the 1986 legalization program." *Id.*

Similarly, in the declaration of Bernard P. Wolfsdorf, an immigration law specialist and the past President of American Immigration Lawyers Association, Wolfsdorf asserts that "a thorough understanding of complex federal litigation, as well as knowledge of a highly specialized area of substantive law—law affecting legalization applicants [and] the rights of class members under the settlement in this action—was required were plaintiffs to prevail in their effort to enforce the CSS settlement on behalf of class members whose applications CIS rejected from abroad or declared abandoned." Decl. Bernard P. Wolfsdorf, ECF No. 714 (Oct. 4, 2011), at 3–4. Wolfsdorf also provides:

> [S]uccessfully enforcing the settlement in Catholic Social Services on behalf of class members whose legalization applications CIS declared abandoned or rejected because they were tendered from abroad required esoteric knowledge of

[a] largely forgotten area of immigration law: the legalization program enacted as part of the 1986 Immigration Reform and Control Act (IRCA). The IRCA established a one-time program that, with few exceptions, ended over 23 years ago. The IRCA legalization program comprised provisions nowhere else existing in immigration law. Messrs. Schey and Holguin are among a very small number of lawyers who continue to represent legalization applicants; by far the vast majority of my colleagues in the immigration bar have not represented legalization applicants in many, many years, if they have ever represented any such clients at all. Recognizing that the practices plaintiffs' challenged in their motion to enforce the settlement—that those practices were different from those the INS pursued during the 1987–88 legalization application year and violated the CSS settlement—required recondite knowledge of an obscure area of the law few, if any, other lawyers anywhere in the country now have.

*Id.* at 4.

The government contends that "enforcement of the Settlement Agreement did not involve constitutional law or the rights of detained aliens"; "Plaintiff's Motion to Enforce involved a simple interpretation of the Settlement Agreement, and the Court essentially adopted Defendants' proposal for the resolution of the dispute"; and "Counsel's monitoring of the Special Master proceedings under the Settlement Agreement involve[d] little more than opening and reading their mail." Defs' Opp'n, ECF No. 703, at 8–9. Defendants make no argument that counsel for Plaintiffs lack expertise on the law affecting legalization applicants, but instead, argue that Plaintiffs gained their knowledge of the legalization program through this very litigation, making enhancement of fees unwarranted. *Id.* at 8 (relying upon *Natural Resources Defense Council, Inc. v. Winter,*

543 F.3d 1152, 1159 (9th Cir.2008)). Defendants' arguments fail.

Defendants' application of the reasoning in *Natural Resources Defense Council* to the circumstances of this case is inapposite. In *Natural Resources Defense Council,* the Ninth Circuit found that junior associates who had no prior experience in environmental litigation and no publications or outside research on environmental topics, but who were claiming a distinctive knowledge of environmental law based upon their work over the course of three years in litigating "a concurrent companion case before the same court, involving similar factual and legal issues, on behalf of nearly identical clients, and against the same agency, including some of the same opposing counsel" were not entitled to enhanced fees under EAJA because "all attorneys" are expected "to be experts of their own cases and their clients' litigation goals." 543 F.3d 1152, 1159.

In contrast, Peter Schey has, among other qualifications, founded and served as Executive Director of what is currently the National Immigration Law Center; founded and served as Executive Director of the Center for Human Rights and Constitutional Law, Inc.; served as an adjunct professor at University of Southern California Law Center and as a lecturer at University of California at Los Angeles School of Law, where he taught courses on immigration law; served as lead or co-lead counsel in a number of class action lawsuits on behalf of immigrants, one of which specifically involved provisions of IRCA's legalization program, *see Immigrant Assistance Project of the Los Angeles County Federation of Labor (AFL–CIO) v. INS,* 306 F.3d 842 (9th Cir.2002); and was appointed by President Jimmy Carter as a legal consultant for a Commission on Immigration and Refugee Policy. *See* Decl. Peter Schey, ECF No. 681, Attach. 4, at 4–

13. Schey graduated from law school in 1973. *Id.* at 3.

According to the resume and declaration of Carlos Holguin, Mr. Holguin has worked on legal issues involving immigration since 1977, is the author of numerous articles and publications concerning the legal rights of immigrants and refugees, and has argued cases before the en banc Ninth Circuit Court of Appeals and the United States Supreme Court. *See* Decl. Carlos Holguin, ECF No. 681, Attach. 3, at 2, 4–6 (Jan. 13, 2010). Holguin graduated from law school in 1979. *Id.* at 4.

According to his firm website, Robert H. Gibbs graduated in law school in 1974, has specialized in immigration law since 1977, and is a founder of the Northwest Immigrant Rights Project. *See* GIBBS HOUSTON PAUW, http://www.ghp-law.net/gibbs.html (last visited Nov. 8, 2011).

Counsels' depth of expertise in immigration law, and specifically the legal issues related to legalization applicants, is thus highly distinguishable from the junior associates, with no prior or outside environmental law experience, who sought enhanced fees in *Natural Resources Defense Council.*

Even if, as Defendants argue, Plaintiffs' counsel gained their knowledge relating to legalization applicants primarily through the course of this litigation, the 25–year duration of this class action and its numerous iterations at all levels of the federal judicial system only strengthen Counsels' argument that they possess expertise in this particular esoteric area of immigration law and that they are currently of the few attorneys in the country qualified to adequately enforce the post-settlement proceedings in this case.

The court is satisfied that Plaintiffs have sufficiently established that their counsel has particular legal expertise on the issues presented by IRCA's largely-defunct legalization program. Such knowledge goes beyond basic immigration expertise and, instead, provides a prime example of an "esoteric nook[ ] and crann[y] of immigration law." Counsels' nuanced understanding of the practical effects and implications of the INS's interpretation of the IRCA legalization provision and the agency's application of the 1991 abandonment regulation to class members, in addition to Counsels' understanding of the difficulties and roadblocks faced by legalization applicants, was necessary to give the Plaintiff class "a fair shot at prevailing" in both the underlying litigation at issue, as well as Plaintiffs' post-settlement proceedings.

Accordingly, the court determines that counsel for Plaintiffs possess "distinctive knowledge" and "specialized skill" that was "needful to the litigation in question."

**b. Not Available Elsewhere at the Statutory Rate:**

Plaintiffs assert that qualified counsel was not available for this litigation at the statutory maximum rate.

In support of Plaintiffs' assertion, Bernard P. Wolfsdorf attests:

> Developing expertise in the law affecting plaintiff class members would be prohibitively time-consuming and, retaining qualified counsel at the inflation-adjusted EAJA rate all but impossible. When immigration practitioners [ ] do undertake federal litigation, they typically charge three to four times the inflation-adjusted EAJA statutory rate. I do not believe any qualified lawyer could have been found to litigation this case for less than perhaps $500 per hour.

Decl. Bernard P. Wolfsdorf, ECF No. 714, at 5.

Similarly, in Judy London's declaration, London provides that "[e]ven were lawyers qualified to vindicate class members' rights under the CSS to be found, I firmly be-

lieve none would have prosecuted an enforcement motion on behalf of the CSS plaintiff class at the inflation-adjusted EAJA rate." Decl. Judy London, ECF No. 715, at 3.

In response, Defendants quote *Ramon–Sepulveda v. INS*, 863 F.2d 1458 (9th Cir. 1988) for its provision that "there is no shortage of attorneys in Los Angeles qualified to assist aliens in deportation proceedings." 863 F.2d at 1463. This argument fails.

Because specialized immigration expertise was necessary to give plaintiff class a fair shot at prevailing in their motion to enforce the settlement agreement, and because the court credits the declarations of Judy London and Bernard P. Wolfsdorf, the court finds that qualified counsel was not available for this litigation at the maximum rate provided under EAJA.

**c. Prevailing Market Rates:**

In addition to establishing their entitlement to enhanced rates under EAJA, Plaintiffs must also show that the requested enhanced rates are "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Nadarajah*, 569 F.3d at 916 (citing *Blum v. Stenson*, 465 U.S. 886, 895 & n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

Counsel has provided the declaration of Carol Sobel, a private civil rights attorney based in Southern California, who graduated from law school in 1978 and asserts that her "billing rate for 2011 is $750 an hour." Decl. Carol Sobel, ECF No. 707, Attach. 1, at 5. Sobel also declares that, in a "survey of market rates on the billing rates of attorneys who do other types of complex litigation," she found that "Brad Seligman of the Impact Fund ... averred that his rate in 2008 was $695 an hour." *Id.* at 11.

In a declaration submitted by Angelo A. Paparelli, a partner in the Business Immi-

gration Practice Group of Seyfarth Shaw LLP, and a founder and past president of the Alliance of Business Immigration Lawyers, Paparelli declared, "I am aware that Mr. Schey has a small complex litigation private practice in addition to his work at the Center for Human Rights and Constitutional Law (CHRCL), and routinely charges approximately $750 per hour." Decl. Angelo A. Paparelli, ECF No. 716 (Oct. 5, 2011), at 4.

Given the prevailing market rates for specialized and highly experienced private civil rights and immigration attorneys specializing in complex litigation, the court determines that the $500 per hour fee sought by Plaintiffs is "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."

This court therefore determines that the plaintiffs have established that an enhanced fee award under the EAJA of $500 per hour is warranted in this particular case. Plaintiffs are therefore awarded attorney's fees against Defendants in the amount of $143,625.

**2. Costs**

 The EAJA provides that the prevailing party can recover litigation expenses and costs in addition to attorneys' fees. 28 U.S.C. § 2412(a)(1); § 2412(d)(1)(A). "Expenses" includes those that are normally billed a client, such as telephone calls, postage, and attorney travel expenses. International Woodworkers, *Local 3–98 v. Donovan*, 792 F.2d 762, 767 (9th Cir.1986). Plaintiffs seek the award of costs for "fees and other expenses" under the EAJA, in accordance with plaintiffs' bill of costs. Pls' Mot., ECF No. 681, at 12–13. Because plaintiffs have established their eligibility for an award of fees and costs under the EAJA,

and defendants do not contest the award of such costs, this court finds that the plaintiffs are entitled to their sought costs, in the amount of $2,033.27, under the EAJA.

## IV. CONCLUSION

For the foregoing reasons, the court ORDERED that plaintiff's motion for attorneys' fees and costs is GRANTED, with $143,625 awarded for attorneys' fees, and $2,033.27 awarded for attorneys' costs.

IT IS SO ORDERED.